**UNITED STATES of America, Appellee,**

v.

**Claddis ARRINGTON, Brooks Gregory Davis, Mary Ferguson Davis, and Wayne Davis, Defendants–Appellants.**

**Nos. 402, 403, 409 and 503, Dockets 88–1351, 88–1353, 88–1378 and 88–1394.**

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1988.

Decided Jan. 23, 1989.

properly rejected the prejudicial "spillover" argument framed in those terms.

Richard B. Lind, New York City, for defendant-appellant Arrington.

Victor Rocco, New York City (James A. Altman, Julie A. Prag, Botein, Hays & Sklar, New York City, of counsel), for defendants-appellants Brooks Davis and Mary Davis.

Richard Ware Levitt, New York City, for defendant-appellant Wayne Davis.

Daniel C. Richman, Asst. U.S. Atty. for S.D. New York, New York City (Rudolph Guiliani, U.S. Atty. for S.D. New York, Celia Goldwag Barenholtz, Asst. U.S. Atty. for S.D. New York, New York City, of counsel), for appellee.

David B. Smith, Alexandria, Va. (English & Smith, Alexandria, Va., of counsel), for amicus curiae National Ass'n of Criminal Defense Lawyers.

Before LUMBARD, VAN GRAAFEILAND, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Claddis Arrington, Brooks Gregory Davis, Mary Ferguson Davis, and Wayne Davis appeal from an order entered in the United States District Court for the Southern District of New York (Griesa, J.), which denied their motions under Fed.R.Crim.P. 12(b)(1) to dismiss criminal charges against them. Defendants were charged with various offenses arising from participation in a conspiracy to distribute narcotics. Soon after the commencement of trial, the government informed the court of an alleged plot to silence witnesses, and the possible involvement of counsel for Brooks Davis in that plot. On April 28, 1988, the court declared a mistrial as to Arrington and Wayne Davis. On May 2, 1988, mistrials were declared as to Brooks and Mary Davis.

After the government announced that it intended to retry all four defendants, the defendants moved to dismiss the charges. The defendants argued that retrial is barred by the double jeopardy clause because there was no "manifest necessity" to declare the mistrials. Defendants renew this argument on appeal. For the reasons stated below, we affirm the decision of the district court as to all defendants.

## BACKGROUND

In a superseding indictment filed March 26, 1988, Arrington, Brooks Davis, Mary

Davis, and Wayne Davis were charged, *inter alia*, with conspiring to possess and distribute narcotics in violation of 18 U.S.C. § 841. The government alleged that defendants were part of a large-scale narcotics distribution organization, in which Brooks Davis was king-pin, Wayne Davis was lieutenant, Arrington was a dealer, and Mary Davis supplied customers.

Among the witnesses the government intended to call to testify at trial were Keith Greene and Henri Mitchell. Both Greene and Mitchell had pleaded guilty to narcotics offenses and entered into cooperation agreements with the government. Prior to trial, however, Greene and Mitchell each gave sworn statements to defense counsel recanting previous sworn statements they had given to the government. The government also intended to call Isaac Diggins, an informant who had secretly recorded conversations with Arrington and Brooks Davis. Two days before trial was to begin, however, Diggins was shot.

On April 10, 1988, the day after the shooting, Aaron Harper confessed to his role in the attempted murder of Diggins. Harper told the government that Wayne Davis had called him a few weeks earlier and asked for his help in locating and murdering potential witnesses in the upcoming trial. Harper further related that on April 9, 1988, defendant Arrington and another unidentified man ordered Harper, upon threat of death to himself or his family, to arrange for Diggins to be at a specified location that night so that he could be killed. Harper complied. On April 28, Harper entered guilty pleas to charges arising from his involvement in both the Diggins shooting and drug transactions with Wayne Davis.

On April 11, 1988, the first day of jury selection, the government made various motions based on the information furnished to it by Harper, whose identity was kept confidential. The court granted motions for an anonymous jury and to remand Arrington, Mary Davis, and Wayne Davis, who had been released on bail, but denied a motion for a continuance.

After the defendants were returned to custody, Harper was inadvertently placed in the same holding cell in the Metropolitan Correctional Center ("MCC") as Arrington, Brooks Davis, and Wayne Davis. A conversation ensued between the men, at the end of which Brooks Davis stated that he would send his lawyer to see Harper. Harper testified that Brooks Davis told him that the purpose of the lawyer's visit was for Harper to sign a paper stating that he "ain't going to testify." The next morning, Robert Simels, who was Brooks Davis' counsel, visited Harper alone at the MCC. What occurred at this meeting is not clear.

On April 12, 1988, Simels presented the court with an affidavit signed by Harper, whom Simels identified as the government's confidential informant. The affidavit stated that the government had pressured Harper to "lie on people," and it presented an explanation of the Diggins shooting that differed from the government's account. It further stated that Harper did not take part in, or have knowledge of, any illegal activities involving Brooks Davis, Wayne Davis, or Mary Davis. Simels later testified that he met alone with Harper at the MCC, and Harper freely related a version of events that contradicted the version offered by the government. Simels testified that he prepared the affidavit from his notes of the meeting, and then made arrangements for Michael Gavenchak, an associate of counsel for Wayne Davis, to bring the affidavit to Harper to sign. In the meantime, the trial went forward with Simels assuming the role of lead defense counsel.

After the sixth day of trial, the government filed a letter with the court which set forth new information regarding the circumstances of Harper's recantation. The government alleged that during their MCC meeting, Simels warned Harper that he should not testify against his "friends" from the "street while [his] family [was] out there." The government further alleged that Harper signed the paper presented to him by Gavenchak without reading it. At this time, the government did not move for a mistrial, but did raise the issue of whether Simels could ethically

continue as Brooks Davis' trial counsel since Simels might now become a witness at trial.

The district court held a series of conferences with counsel for all parties to consider whether disqualifications of counsel and/or declarations of mistrials were required. During these conferences, the government announced its intention to call Harper to testify about his drug activities with the defendants, the Diggins shooting, and the Simels threat. The defendants indicated their desire to defend against this evidence. According to the district court, the next step was "to determine whether Harper would really testify in a way to implicate and accuse Mr. Simels," because if Harper would not so testify then Simels would not become a witness in the case, and disqualification would be unnecessary. To this end, a hearing was held outside the presence of the jury, solely to determine if Harper would testify at trial in a manner consistent with the government's proffer. Harper's testimony at this hearing was in substantial conformity with the government's accounts of the attempted murder of Diggins and the events at the MCC.

Following the hearing, counsel for Arrington and Wayne Davis reasserted their intention to call Simels to testify. The court found that Arrington and Wayne Davis were entitled to present Simels' testimony in their defense but that Simels could not appear as a witness before the same jury that observed him perform as lead defense counsel. The court declared mistrials as to Arrington and Wayne Davis. The court endeavored, however, to continue the trial with regard to Brooks and Mary Davis.

Over the next day and a half, the district court heard oral argument and received written submissions as to whether further mistrials could be avoided. To this end, Brooks and Mary Davis offered to waive cross-examination of Harper. Other suggestions, such as having an adjournment of the trial in order to allow the appointment of new counsel for Brooks Davis, were also put forth. The court found none of the suggested solutions to be workable. It

characterized the proposed waivers as "foregoing the presentation of the most directly relevant evidence ... contradicting Harper's version." Furthermore, the court found that Simels' testimony would "be of great assistance to Brooks Davis if it were true." Accordingly, the court disqualified Simels from continuing as counsel for Brooks Davis. Then, finding that it "would present hopeless confusion and difficulty in the minds of the jurors to have Mr. Simels act at the beginning of the trial in his vigorous and lead role as defense counsel, and suddenly to have him depart and come back as an accused party and a witness," the court declared mistrials as to the remaining defendants.

### DISCUSSION

#### A. *Claddis Arrington and Wayne Davis.*

Arrington and Wayne Davis contend that their retrial is barred by the fifth amendment because there was no manifest necessity to declare mistrials against them. Specifically, they argue that since it was not their counsel who was to become a witness at trial, the declaration of mistrials as to them was improper. We disagree.

The fifth amendment does not bar retrial where there is "manifest necessity" to declare a mistrial. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). "Under this standard, the prosecution bears the 'heavy' burden of showing a mistrial to have been demanded by a 'high degree' of necessity." *United States v. Kwang Fu Peng,* 766 F.2d 82, 85 (2d Cir. 1985) (quoting *Arizona v. Washington,* 434 U.S. 497, 505–06, 98 S.Ct. 824, 830–31, 54 L.Ed.2d 717 (1978)). The finding of manifest necessity does not lend itself to the simple application of precise formulas or rigid rules. Thus, "[a] great deal of discretion [is] vested in the trial judge, who is usually best situated to determine the degree of necessity for the declaration of a mistrial." *Dunkerley v. Hogan,* 579 F.2d 141, 145 (2d Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). The trial judge's evaluation is entitled to "the highest degree of respect." *Washington,* 434 U.S. at 511, 98 S.Ct at

833; *see also United States v. Ruggiero*, 846 F.2d 117, 123 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988); *United States v. Mastrangelo*, 662 F.2d 946, 950 (2d Cir.1981), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982).

During the trial, Arrington and Wayne Davis announced their intention to call Simels to testify about a critical issue in the case. The problem created by this proposed testimony is not, as argued by defendants, strictly an issue of conflict between an attorney and his client. Regardless of which defendant Simels represented, the jury observed him acting as lead counsel during the entire trial. Thus, the problem presented by Simels' dual role of attorney and witness is whether such a performance so blurs the line between argument and evidence that the jury's ability to find facts is undermined.

The inherent difficulties present when a lawyer is both counsel and witness are recognized by Ethical Consideration 5–9 of the American Bar Association Code of Professional Responsibility, which states that "opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case." Once a jury sees an attorney take an oath on the witness stand, it may accord testimonial weight to that which he has argued, *cf. MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1208 (S.D.N.Y.1981), or it may place undue weight on the testimony of an officer of the court. *Id.* While EC 5–9 contemplates testimony by an attorney on behalf of his client, the same concerns are present when lead defense counsel is called to testify on behalf of a defendant not his client.

We do not mean to suggest that an attorney in a multiple-defendant case may never testify on behalf of his client's co-defendant. *See United States v. Reeder*, 614 F.2d 1179, 1186 (8th Cir.1980). The propriety of such testimony is left to the discretion of the trial court.

■ Here, the trial court was in the best position to observe Simels' performance before the jury "in his vigorous and lead role as defense counsel." The court carefully considered the nature of Simels' proposed testimony and its critical importance to the defense of Arrington and Wayne Davis. The court's finding that there was manifest necessity to declare mistrials as to Arrington and Davis because the jury would be unable to "judge [Simels'] credibility as a witness independently of their view of his activities as a lawyer," was a proper exercise of the court's discretion.

### B. *Brooks Davis.*

#### 1. Admissibility.

Brooks Davis contends that the district court erred in ruling Harper's testimony admissible, that the disqualification of Simels thus was unnecessary, and consequently that the declaration of a mistrial was not a manifest necessity. The government intended to call Harper to testify about his involvement in drug transactions and the Diggins shooting, as well as the threat allegedly made by Simels at the MCC. Evidence of the threat was offered to show consciousness of guilt and the existence of the conspiracy. In the district court, and on this appeal, Brooks Davis' main objection to Harper's testimony is not based on "conventional evidentiary grounds." Rather, he contends that error lies in the failure of the district court to adhere to procedures which he claims were established by this Court to govern the admissibility of evidence that tends to implicate counsel.

Specifically, Brooks Davis contends that our holdings in *United States v. Valencia*, 826 F.2d 169 (2d Cir.1987); *United States v. McKeon*, 738 F.2d 26 (2d Cir.1984); and *United States v. Cunningham*, 672 F.2d 1064 (2d Cir.1982), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984), require that before an attorney's statement may be used against his client in a criminal trial, the government must prove, by a preponderance of the evidence at a special hearing, that the statement was clearly made, that an innocent explanation does not exist, and that the statement is the equivalent of a testimonial statement of the

defendant. Furthermore, defendant argues that the district court then must balance the government's need to introduce the evidence against the defendant's interest in retaining his attorney. We, however, agree with the district court's holding that the cited cases "in no way support any argument for holding a special hearing or excluding Harper's testimony."

Of the cases relied on by Brooks Davis, *Cunningham* is most closely analogous to the instant case in that it concerned the admissibility of evidence tending to implicate defense counsel in a scheme to conceal evidence. At issue in *Cunningham* was the location of certain envelopes. 672 F.2d at 1067–68. The government sought to introduce the testimony of a witness who claimed that defendant's counsel had told her that he, counsel, was responsible for the envelopes and "the envelopes were safe." *Id.* at 1068. "On the premise that [this] testimony might be admissible at trial, and that if it were, [counsel] ought to be a witness," the district court disqualified counsel pursuant to Rule 5–102(A) of the Disciplinary Rules of the American Bar Association Code of Professional Responsibility ("Disciplinary Rules"). *Id.* at 1070. On appeal, we noted that "the question of admissibility ha[d] not definitely been decided," and under that circumstance, the defendant's "Sixth Amendment right to be represented by counsel of his own choice is too important to be denied on the basis of a mere, though substantial, possibility." *Id.* at 1075. Consequently, we vacated the disqualification order, and remanded the case to the district court for a determination of whether the evidence implicating counsel was admissible.

Contrary to Brooks Davis' interpretation, we did not instruct the *Cunningham* district court to determine the admissibility of the disputed testimony by any mode of analysis other than application of the Federal Rules of Evidence. The "balancing task" that we referred to in *Cunningham* is not, as defendant contends, part of the determination of admissibility. Rather, once it has been determined that evidence implicating counsel is admissible, a court must then "balance the defendant's consti-

tutional right [to retain counsel of choice] against the need to preserve the highest ethical standards of professional responsibility." *Id.* at 1070. The error in *Cunningham* was that we were asked to engage in this balancing at a time when it had yet to be determined that the evidence which made the balancing necessary was admissible.

In *McKeon*, we considered the evidentiary use against a criminal defendant of his counsel's argument to a jury in an earlier proceeding. We began by observing the general proposition that " '[s]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney.' " *McKeon*, 738 F.2d at 30 (quoting *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir.1981), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983)). We recognized, however, that when the proffered statements consist of *prior jury argument*, policy considerations dictate that the statements not be subjected "to the more expansive practices sometimes permitted under the rule allowing use of admissions by a party-opponent." *Id.* at 31. Thus, in order to avoid "trenching upon" those policies, *see id.* at 32–33, we established procedures to circumscribe the use of prior jury argument. *See id.* at 33. Contrary to defendant's assertion that these procedures apply to the use of all statements by defense counsel, we clearly stated in *McKeon* that we were "circumscrib[ing] the evidentiary use of *prior jury argument.*" *Id.* (emphasis added); *see id.* at 32.

Finally, in *Valencia*, we affirmed the district court's refusal to admit, under Fed. R.Evid. 801(d)(2)(D), statements made to the prosecuting attorney by defense counsel. In reaching this result, we noted that "the trial judge must be accorded considerable discretion in determining the application of Rule 801(d)(2) to statements of an attorney offered by the prosecutor against a criminal defendant." *Valencia*, 826 F.2d at 173. While we cautioned against "the routine use of attorney statements against a criminal defendant," *id.* at 172, we ana-

lyzed the disputed statements under Rule 801(d)(2), and not under special procedures that the defendant contends were established by *Cunningham* and *McKeon.*

█ Accordingly, we find no support for Brooks Davis' contention that there are special procedures to be followed, or balancings to be performed as a prerequisite to the evidentiary use of a defendant's counsel's out-of-court statements. We further find no reason for adopting such measures now. Defendant predicts that there will be "virtually automatic disqualification [of counsel] ... any time a person is willing to testify that defense counsel threatened him," and thus, vigorous and legitimate representation of clients will be deterred. This problem, however, does not appear to have materialized in the almost seven years since *Cunningham* was decided. Safeguards already exist in that trial courts are equipped to exclude the irrelevant and prejudicial, and are accorded "considerable discretion" in the application of Rule 801(d)(2) to attorney's statements. *Valencia,* 826 F.2d at 173. Moreover, conditioning the admissibility of a statement by counsel on the defendant's interest in retaining counsel would produce the anomalous result of admitting statements made by a co-conspirator who had recently become defendant's counsel, but not admitting the statements if the co-conspirator had long been defendant's counsel. *Cf. Cunningham,* 672 F.2d at 1070–71 (interest in retaining counsel is "particularly strong" where counsel represented defendant for over six years and in numerous proceedings).

█ Turning to the facts of the case before us, we note that this is not a routine case. Harper's disputed testimony implicating Simels in a scheme to keep witnesses from testifying was offered after two government witnesses had already recanted, and a third had been shot. Simels went to see Harper alone at the MCC. Although the affidavit he procured contains Harper's disavowal of knowledge of or involvement with any criminal activity of the defendants, Harper pleaded guilty to participating in the defendants' narcotics conspiracy and to conspiring to commit murder in aid of

racketeering—charges carrying possible maximum sentences of twenty and ten years respectively. The district court found Harper to be "quite a credible witness." Judge Griesa carefully considered the nature of Harper's proposed testimony, and all that would occur as a result of its admission. Under the circumstances, we cannot say that it was an abuse of discretion to rule Harper's testimony fully admissible against Brooks Davis.

2. *Proffered waivers.*

Once the decision was made to admit Harper's testimony, it was inevitable that Simels would become a witness—either sworn or unsworn—in the proceedings, thus requiring the disqualification of Simels as Brooks Davis' counsel under Disciplinary Rule 5–102(A). Brooks Davis contends, however, that the disqualification of Simels, and consequently the declaration of a mistrial, could have been avoided by a series of proposed waivers. Specifically, defendant argues that he has the right, under the sixth amendment, to retain Simels as counsel and to waive any direct challenge to Harper's testimony in order to prevent Simels from becoming a witness. Defendant further argues that the district court abused its discretion in declining to honor his waiver of conflict-free counsel. We find these contentions to be without merit.

We have recognized that the right to retain counsel of choice is "a right of constitutional dimension." *United States v. Wisniewski,* 478 F.2d 274, 285 (2d Cir. 1973). The right, however, is not absolute. As the Supreme Court has recently stated, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* —— U.S. ——, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

Relying on *Cunningham* and *United States v. Curcio,* 680 F.2d 881 (2d Cir. 1982), defendant asserts that he is entitled to make a knowing and intelligent waiver

of the right to be represented by conflict-free counsel, and thus retain Simels as counsel. Defendant's argument, however, evinces little appreciation for the nature of the conflict enveloping Simels. The conflict here is "not the more usual one of multiple representation." *United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984). Rather, counsel has been placed in the position of having to worry about allegations of his own misconduct. As we noted in *Cancilla,* "[w]hat could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities?" *Id.*

In the district court's view,

Mr. Simels ... has exposed himself to charges of the greatest misconduct. He has a personal stake in the matter. Whether he is ever indicted for a criminal violation, I don't know. But he certainly has a problem which will eventually go before the grievance committee of this court as to whether he is to be disciplined in this court. And in any event, he is and he knows it and it has been stated by the court, he is now accused of very serious misconduct, potentially criminal in nature.

Thus, if the court had accepted Brooks Davis' proffered waiver of conflict-free counsel, he would have been represented by counsel encumbered with a strong incentive to conduct the trial in a manner that would minimize counsel's own exposure. This conflict would continue to exist even if all references to Simels were redacted from Harper's testimony, or if Brooks Davis waived the presentation of any direct rebuttal to Harper's testimony.

The extent to which a district court may override a defendant's waiver of his attorney's conflict of interest has recently been explored by the Supreme Court. In *Wheat,* the Court recognized that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." 108 S.Ct. at 1697. To this end, a district court "should not be required to tolerate an inadequate repre-

sentation of a defendant." *Id.* at 1698 (quoting *United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978)). Consequently, "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver." *Id.*

■ The testimony of Harper was very powerful evidence against Brooks Davis. As the district court explained, by waiving the right to call Simels, "Brooks Davis would be foregoing the presentation of the most relevant evidence on the point," evidence that would "be of great assistance to Brooks Davis if it were true." Furthermore, this waiver was offered by Brooks Davis in order to retain the representation of an attorney saddled with a serious conflict of interest. While the prospect of allowing someone to defend himself with one hand tied behind his back may present an interesting spectacle in a wrestling ring, the court's "institutional interest in the rendition of just verdicts in criminal cases," *id.,* and the proper administration of justice require that a criminal defendant not be so encumbered.

■ Since we agree with the district court's decision declining Brooks Davis' proffered waiver, we find the disqualification of Simels to have been proper, and thus the declaration of a mistrial as to Brooks Davis to have been a manifest necessity.

### C. *Mary Davis.*

Mary Davis contends that even after mistrials were declared as to the other defendants, she should have been allowed to proceed to trial alone. She argues that Harper's testimony, which would have drawn Simels into the case, was inadmissible against her, and thus there was no manifest necessity to declare a mistrial. We disagree.

Under Fed.R.Evid. 801(d)(2)(E), statements offered against a party, and made by a co-conspirator of that party in the course of and in furtherance of a conspiracy, are admissible against that party. *See, e.g., United States v. Persico,* 832 F.2d 705, 715 (2d Cir.1987), *cert. denied,*

—— U.S. ——, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). An admissible statement of a co-conspirator is admissible against all other members of the conspiracy. Membership in a conspiracy may be shown by a quantum of proof " 'lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury.' " *United States v. Ginsberg*, 758 F.2d 823, 828 (2d Cir.1985) (quoting *United States v. Alvarez–Porras*, 643 F.2d 54, 57 (2d Cir.), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981)).

■ Mary Davis argues that evidence of the Simels' threat is not admissible against her because it was not made in the course of the underlying conspiracy. Generally, a statement is not made in the course of a conspiracy when it is made after the main objective of the conspiracy has been accomplished. *See Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). However, even where particular crimes have already been committed, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated." *United States v. Rucker*, 586 F.2d 899, 906 (2d Cir.1978). The fact that some of the conspirators have been indicted and incarcerated does not inexorably lead to the conclusion that the conspiracy has been terminated. *See Persico*, 832 F.2d at 715–16 (conspiracy continued after incarceration of some members).

Here, the defendants were not charged with conspiracy to bring about a single illegal result which has already been accomplished. Rather, they stand charged with conducting a large-scale narcotics distribution organization. The plot to silence witnesses furthers the goals of the conspiracy in that the distribution of narcotics would be facilitated by the acquittal of all the defendants. We agree with the district court's conclusion that Harper's testimony is fully admissible against Mary Davis.

Once the testimony implicating Simels is admitted, Simels would become a sworn or unsworn witness, regardless of whether his client remained in the trial. Thus, the problem confronting Mary Davis is the same as faced by co-defendants Arrington and Wayne Davis. Because the district court found that the jury would be unable to "judge [Simels'] credibility as a witness independently of their view of his activities as a lawyer," manifest necessity existed to declare a mistrial as to Mary Davis as well.

## CONCLUSION

We have examined the defendants' remaining claims and find them to be without merit. In view of the foregoing, the order of the district court is affirmed as to all defendants.