UNITED STATES of America, Plaintiff,

v.

Sam Frank URBANA, et al., Defendants.

No. 89–360–CR.

United States District Court,
S.D. Florida.

May 10, 1991.

Joe H. Vaughn, Special U.S. Atty., Miami, Fla.

Jose Quinon, Quinon & Straefer, Miami, Fla., for Urbana's Counsel.

Roy J. Kahn, Miami, Fla., for Salerno.

Kenneth B. Whitman, Fort Lauderdale, Fla., for Tannenbaum.

Henry Bugay, Miami, Fla., for Braham.

Albert J. Krieger, Kenneth Kukec, Miami, Fla., for Cortina.

## MEMORANDUM OPINION

EDWARD B. DAVIS, District Judge.

In the face of accusation by the people, an accused has but one person in whom he can confide, his counsel, whose allegiance shall be undivided, his trust uncompromising, his efforts tireless. Immersed in proceedings far too complex for the unacquainted, the accused blindly places faith in his attorney to protect him at every turn. It comes as no surprise, therefore, that those facing significant restraints on liberty invest whatever resources they have to retain the very best counsel available.

Sam Frank Urbana stands before this court accused of conspiring to participate in a RICO enterprise. The 44-page, 23-count indictment charges that Mr. Urbana and seven codefendants agreed to obtain money through theft, collection of unlawful debts, bookmaking operations, and importation of "gray market" automobiles into the United States. At considerable expense, Mr. Urbana retained counsel of his own choosing to represent him in what was expected to be a protracted and complex prosecution. Over time, he and his lawyer have built a valued attorney-client relationship.

On the eve of trial, the government has moved, *ore tenus*, to disqualify Mr. Urbana's counsel from representing him at trial.[1] The government asks this court to override Mr. Urbana's right to counsel of choice in order to preserve the integrity of the criminal process. Having considered every possible alternative short of disqualification, and sensitive to Mr. Urbana's unequivocal desire to be represented by *his* choice of counsel, this court must nevertheless grant the government's motion.

## I. BACKGROUND

On April 5, 1990, approximately ten months after the indictment was filed, the government moved to disqualify Mr. Urbana's lawyer from representing him. The government claimed to have evidence implicating Mr. Urbana's lawyer in an act in furtherance of the alleged RICO conspiracy. According to the government, co-defendant Thomas Patton informed the government that in May, 1986, he went to the home of Mr. Urbana's lawyer at the direction of Mr. Urbana. Patton, who since December, 1989 has been cooperating with the government, stated that he and Mr. Urbana's lawyer drove to the office of another local attorney with a bag containing stolen jewelry. According to Patton, he and other associates of Mr. Urbana had stolen the jewelry from the home of one Jed Baron, and Mr. Urbana's lawyer was commissioned to return that property to Mr. Baron's lawyer in exchange for $15,000 (the "Jed Baron incident").

After considering arguments in favor of disqualifying Mr. Urbana's lawyer based on his alleged participation in this event, this court denied the government's motion. *United States v. Urbana*, 89–360–Cr–Davis (S.D.Fla. April 13, 1990) (unpublished order denying motion to disqualify). This court was not persuaded that Mr. Urbana's lawyer had anything more to do with the incident than to return allegedly stolen property. Without ruling on the admissibility of the evidence, this court held that:

> In arriving at the proper balance between affording the defendant his counsel of choice and permitting the government to put on its case, this court observes that indeed, the allegations concerning the theft are not charged in the indictment. That evidence, therefore, is only tangentially relevant, and the preju-

---

1. Also pending before the court is the government's motion (filed May 16, 1990) to reconsider the denial of the government's earlier motion to disqualify counsel.

dice to the government's case by precluding the introduction of such evidence would only be marginal. On the other hand, disqualifying [counsel] at this late stage of the case would significantly prejudice Urbana, as [counsel] and Urbana have together been preparing for this complex trial since June, 1989.

*Id.*, slip op. at 2. This court also relied on Mr. Urbana's sworn waiver of his counsel's conflict of interest (docket entry no. 154), and his sworn agreement not to call his counsel as a witness at trial (docket entry no. 155).

In order to minimize the prejudice, this court instructed the parties that to the extent that evidence concerning the Jed Baron incident surfaced at trial, Mr. Urbana's lawyer would not be mentioned by name in connection with the return of the property; instead, any and all witnesses testifying about the incident would simply refer to him as a "local attorney." Counsel for the remaining codefendants informed the court that their clients would not object to such a procedure.

On May 16, 1990, the government moved the court to reconsider the denial of the motion to disqualify. Citing *United States v. Coia*, 719 F.2d 1120, 1123–24 (11th Cir. 1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984), the government argued that evidence about the Jed Baron incident would be admissible even though the incident was not identified as an overt act of the RICO conspiracy. This court took the motion under advisement, but did not formally rule on the motion. The matter remained dormant for ten months while the parties prepared for trial.

On March 7, 1991, four days before trial was scheduled to commence, this court convened for a status conference. At the conference, the government advised the court that just two days earlier, Patton had disclosed to the government, for the first time, additional information about the Jed Baron incident implicating Mr. Urbana's lawyer in criminal activity. The court scheduled an evidentiary hearing for the next day in order to evaluate the testimony.

At the hearing, Patton testified about the Jed Baron incident. He stated that after he and Mr. Urbana's lawyer exchanged the stolen property for cash, they drove back to Urbana's lawyer's home, at which time Patton gave the lawyer $3,000 as remuneration for his services. The two men entered the home, and sometime during the course of the one hour that they were in the home, Mr. Urbana's lawyer supposedly proposed a "dope score," a drug "rip-off," to Patton.[2] Furthermore, Mr. Urbana's lawyer allegedly showed Patton approximately twenty to twenty-five kilograms of cocaine which were stored in a safe located in the billiard room overlooking the bay.[3]

To test the credibility of the witness, this court invited all counsel to cross-examine Patton on the germane issue before the court. Mr. Jose Quinon, representing Mr. Urbana's lawyer for purposes of the proceeding, and Mr. Henry Bugay, counsel for codefendant Braham, engaged Patton in a series of questions about the incident. Patton testified that he had met Mr. Urbana's lawyer on only one occasion predating the Jed Baron affair. According to Patton, he had once accompanied Mr. Urbana to Mr. Urbana's lawyer's office. He could not recall the address of the office, when the meeting occurred, the purpose of the visit, what conversations transpired or for how long they met;[4] he merely remembered meeting Mr. Urbana's lawyer on that sole

---

2. *Transcript* (March 8, 1991) at pages 11 and 56. Patton told Mr. Urbana's lawyer that he would bring the proposal to Mr. Urbana's attention, which he did, but nothing ever came of the proposed "dope score." *Id.*

3. *Id.* at 11 and 35. Patton stated that at a later point in time, he had discussions with codefendant Richard Braham about ripping off the cocaine he had seen in the lawyer's safe, but they

ultimately decided not to "rip-off" the lawyer. *Id.* at 14 and 58.

4. *Id.* at 40–44. Although Patton clearly was having difficulty recalling specific times, dates, and places, he did state that he thought the law office was on either Brickell Avenue or Biscayne Boulevard.

occasion.[5]

Because of the suspect timing of the revelation concerning Mr. Urbana's lawyer's participation in criminality—six days before trial and some fifteen months after Patton had begun cooperating with the government—the court made its own inquiry.[6] Specifically, the court asked Patton whether he had previously disclosed to government agents or the government attorneys, during one of the fifty or so debriefing sessions, the additional information about Mr. Urbana's lawyer. Patton testified that he could not recall whether he had or had not.[7] The government attorneys have stated in open court, and the debriefing agent, Richard Leahy of the F.B.I., testified under oath *in camera*, that Patton had not mentioned the additional allegations until the debriefing session of March 5, 1991.

Based on Patton's testimony, the government renewed its motion to disqualify Mr. Urbana's lawyer from representing Mr. Urbana at trial. The other defendants indicated that they would no longer be willing to waive their right to call Mr. Urbana's lawyer as a witness because he could offer persuasive evidence to undermine Patton's testimony. Mr. Urbana, sensitive to the concerns of his codefendants, proposed that the court sever him and permit his counsel of choice to represent him at trial.

## II. CHOICES

Unfortunately for all concerned, a district court must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context ...

*Wheat v. United States*, 486 U.S. 153, 162, 108 S.Ct. 1692, 1699, 100 L.Ed.2d 140 (1988).

### A. Counsel of Choice

The sixth amendment right to counsel is perhaps the most precious of constitutional rights a criminal defendant possesses. It ensures that an accused has an advocate, skilled in the art of trial advocacy, to test the evidence offered and challenge the allegations levied by the government. Without such a right, as the Supreme Court has recognized in an oft-quoted passage, even the most gifted of laymen might be wrongly convicted:

> [An accused] lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

The correlative right to counsel of choice, though not absolute, is similarly of constitutional dimension. *United States v. Collins*, 920 F.2d 619, 625 (10th Cir.1990). Like the sixth amendment right to self-representation, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the right to counsel of choice, "reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding." *Flanagan v. United States*, 465 U.S. 259, 268, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288 (1984). Although its deprivation does not implicate all of the concerns attendant to proceeding with no counsel at all, courts have acknowledged the profound importance of accommodating the accused's selection absent compelling reasons to the contrary. *See generally Caplin & Drysdale, Chartered v. United States*, —— U.S. ——, 109 S.Ct. 2667, 2673, 105 L.Ed.2d 528 (1989) (Blackmun, J., dissenting).

---

**5.** Perhaps the most interesting fact which came to light during cross-examination was that Patton had previously sustained multiple gunshot wounds to the head. No tests were conducted to determine whether the head injury had affected his memory. *Id.* at 49.

**6.** *Id.* at 16–18.

**7.** *Id.* at 17.

Because an accused is bound by his attorney's failings unless prejudice can be demonstrated, *see Strickland v. Washington,* 466 U.S. 668, 691–692, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), the *choice* of counsel may be the most pivotal decision an accused will make. The line between strategy and blunder is often difficult to discern, and an accused will rarely persuade an appellate court that his lawyer's performance has both fallen below acceptable standards and prejudiced his defense. *See generally* Note, *How to Thread the Needle: Toward a Check-list Based Standard for Evaluating Ineffective Assistance of Counsel Claims,* 77 Geo.L.J. 413 (1988) (exploring the low success rate of challenges to effective assistance claims). Thus, the choice of counsel implicates more than just the manner in which a defense will be conducted; it can determine the very efficacy of the representation itself.

So substantial is the qualified constitutional right to counsel of choice that "in a criminal case, an erroneous order disqualifying the lawyer chosen by the defendant should result in virtually automatic reversal." *Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 443, 105 S.Ct. 2757, 2767, 86 L.Ed.2d 340 (1985) (Stevens, J., dissenting).[8] Indeed, a number of the circuit courts have held the erroneous denial of the right to be reversible *per se.*[9] Appellate reversal, however, will rarely amount to more than a Pyrrhic victory. Because the disqualification of counsel is not immediately appealable,[10] *Flanagan,* 465 U.S. at 270, 104 S.Ct. at 1057, the accused must endure a protracted trial with counsel of second choice, assuming, of course, he has resources to retain yet another attorney.[11] Obviously, having to retain a second attorney to "reinvent the wheel," so to speak, imposes additional financial burdens on an already depleted defendant.[12] Furthermore, the accused may not have sufficient resources to retain his original counsel of choice to represent him at a second trial, in which case the second trial may be nothing more than a replay of the first. Not surprisingly, therefore, courts disqualify an accused's lawyer of choice only as "a measure of last resort." *Diozzi,* 807 F.2d 10, 12 (1st Cir.1986).

**8.** The Supreme Court has twice left open the question of whether the erroneous denial of counsel of choice is per se reversible or instead subject to the prejudice analysis germane to a claim of ineffective assistance of counsel as set forth in *Strickland v. Washington,* 466 U.S. 668, 691–692, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984). *See Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 438, 105 S.Ct. 2757, 2765, 86 L.Ed.2d 340 (1985) (disqualification of counsel in civil case not immediately appealable); *Flanagan v. United States,* 465 U.S. 259, 268, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288 (1984) (disqualification of counsel in criminal case not immediately appealable).

**9.** *See, e.g., Collins,* 920 F.2d at 625 ("when a court unreasonably or arbitrarily interferes with an accused [sic] right to retain counsel of his choice, a conviction attained under such circumstances cannot stand, irrespective of whether the defendant has been prejudiced"); *Fuller v. Diesslin,* 868 F.2d 604, 606 (3d Cir.) ("where there is an arbitrary denial of the right to counsel of choice, reversal is *per se*"), *cert. denied,* — U.S. ——, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989); *United States v. Diozzi,* 807 F.2d 10, 16 (1st Cir.1986) ("the disqualification order, regardless of its impact on the actual outcome of the case, is constitutional error requiring us to set aside [the] conviction"); *United States v. Washington,* 797 F.2d 1461, 1467 (9th Cir.1986)

("the denial of a criminal defendant's qualified right to retain counsel of his choice is reversible error regardless whether prejudice is shown"); *cf. United States v. Moya–Gomez,* 860 F.2d 706, 737 (7th Cir.1988) (defendant need not proceed *pro se* in order to preserve for appellate review the denial of counsel of choice), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989).

**10.** At least one circuit appears to hold that a disqualified attorney, to the extent that he has standing, must file a notice of appeal within ten days of the date of the order of disqualification. *United States v. Estevez,* 852 F.2d 239, 242 & n. 6 (7th Cir.1988).

**11.** Especially when facing a complex and protracted trial, an accused can expect to tender a substantial fee, often up front, in order to secure his attorney of choice. Where, as here, the disqualification comes on the eve of trial, after dozens of months of pretrial preparation, the disqualified attorney may have earned most, if not all, of his fee by that time.

**12.** If unable to afford alternate counsel, the accused is constrained to accept appointed counsel, who although presumptively competent and allegiant, is nevertheless not counsel of the accused's choice.

It is against this impressive backdrop of cases recognizing the magnitude of the right to counsel of choice that this court must approach a government motion to disqualify counsel.

### B. Hobson's Choice [13]

■ When the continued representation of a defendant by a particular lawyer threatens to undermine the public's confidence in the system of justice, a court may disqualify that lawyer, notwithstanding his right to counsel of choice. In the seminal case on disqualification of counsel, *United States v. Hobson*, 672 F.2d 825 (11th Cir.), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982), the Eleventh Circuit affirmed a trial court's disqualification order where the government proffered testimony indicating that trial counsel was aware of the drug smuggling scheme for which his client was standing trial and had assisted a cooperating witness in securing illegal employment. The court enumerated a two-prong test germane to disqualification cases implicating Canon 9 of the American Bar Association Model Code of Professional Responsibility ("Model Code").[14] First, the facts must demonstrate "at least a reasonable possibility that some specifically identifiable impropriety" occurred. *Id.* at 828 (quoting *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir. 1976)). Proof of actual wrongdoing is unnecessary. *Id.* Second, the facts must also manifest "that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." *Id.*

■ Because the facts of the instant case closely parallel those in *Hobson*, this court would ordinarily proceed to apply the *Hobson* test. However, since *Hobson*, "[t]he Model Code has been replaced by the

Model Rules ... [and] [u]nder the Model Rules the appearance of impropriety is not a ground for disqualifying a lawyer from representing a party to a lawsuit." *Waters v. Kemp*, 845 F.2d 260, 265 (11th Cir.1988). Rule 16.C. of the LOCAL RULES FOR THE SOUTHERN DISTRICT OF FLORIDA provides that attorneys appearing before this court are governed by the "current Canons of Professional Ethics of the American Bar Association," which no longer include Canon 9. Thus, it would appear that the government's challenge to counsel's continued representation under Canon 9 is not cause for disqualification. *See Waters*, 845 F.2d at 265–266 (Canon 9 inapplicable in the Southern District of Georgia whose local rule relating to professional conduct mirrors LOCAL RULE 16.C.); *accord United States v. Washington*, 797 F.2d 1461, 1466 (9th Cir.1986) ("[w]e have grave doubts whether an appearance of impropriety would ever create a sufficiently serious threat to public confidence in the integrity of the judicial process to justify overriding Sixth Amendment rights").

However, the Eleventh Circuit has not yet foreclosed the application of *Hobson* altogether. In *Waters*, the court noted that "were [it] to apply the appearance of impropriety standard to the facts of [that] case, [its] decision would [have been] the same." *Waters*, 845 F.2d at 266 n. 13; *but see Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 729 n. 6 (11th Cir.1988) (noting, in *dicta*, that *Waters* held "that a purported Canon 9 violation could not be used as a ground for disqualification" in a jurisdiction where the Model Code did not apply). At least one court in this jurisdiction has utilized the *Hobson* test subsequent to the revisions of the A.B.A. professional standards. *See United States v. Walton*, 703 F.Supp. 75, 77 (S.D.Fla.1988) (Roettger, J.) (disqualifying counsel based on allegation that counsel was prepared to

---

**13.** The term "Hobson's choice" refers to "an apparent freedom to take or reject something offered when in actual fact no such freedom exists ... the necessity of accepting one of two or more equally objectionable things." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1076 (1981). The term was coined after liveryman Thomas Hobson (1544–1631) of Cambridge,

England, who rented horses but offered his customer only one choice, that of the horse nearest the stable door.

**14.** Canon 9 mandates that "[a] lawyer should avoid even the appearance of professional impropriety."

use false testimony). And, the Supreme Court in *Wheat* stated that federal courts have an obligation to ensure "that legal proceedings appear fair to all who observe them." *Wheat*, 108 S.Ct. at 1697.

To the extent that *Hobson* has continued vitality in circumstances such as the one presented by this case, this court concludes that disqualification is in order. *Hobson* merely requires in the first instance a "reasonable possibility" that the impropriety occurred. Without expressing an opinion on the ultimate veracity of Patton's testimony, this court finds it sufficient "to carry the court past any requisite threshold necessary to activate *Hobson*."[15] *Walton*, 703 F.Supp. at 77.

The "public confidence" prong of *Hobson* is likewise satisfied. Permitting an attorney to continue in his capacity as trial counsel in spite of allegations implicating him in the criminality charged against his client undermines the integrity of the criminal process. *Hobson*, 672 F.2d at 828; *accord Government of Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir.1984); *cf. United States v. Snyder*, 707 F.2d 139, 146 (5th Cir.1983) ("[a]llowing a lawyer who has been indicted for the same crime with which his client is charged to represent that client would not only arouse public suspicion, but would shock the public's sensibilities outright"). "The likely public perception of an attorney who was allegedly involved in the very conspiracy for which the client is on trial is self-evident." *United States v. Marren*, 720 F.Supp. 735, 743 (S.D.Ill.1989), *aff'd*, 919 F.2d 61 (7th Cir. 1990). Because the allegations at issue in this case implicate counsel in the very conspiracy charged in the indictment, this court concludes, in congruence with virtually every reported decision on this issue, that the balance weighs in favor of disqualification.

Moreover, as the Fifth Circuit has observed in a case applying *Hobson:*

Under this analysis, a defendant cannot waive his right to be represented by a lawyer who is innocent of serious impropriety, "because the ethical violation involves public perception of the lawyer and the legal system rather than some difficulty in the attorney's effective representation of the defendant."

*Snyder*, 707 F.2d at 145 (quoting *Hobson*, 672 F.2d at 829).

### C. No Choice

Even if a court's "vague concerns about public confidence in the integrity of the judicial process," *Washington*, 797 F.2d at 1466, were not satisfactory grounds for disqualification, this court would still find disqualification necessary in this instance. At this juncture, this court is persuaded that the evidence concerning the Jed Baron incident and the additional allegations against Mr. Urbana's counsel are admissible at trial. *See United States v. Cunningham*, 672 F.2d 1064, 1075 (2d Cir.1982) (before disqualifying counsel, district court must first pass on the admissibility of evidence implicating counsel), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984). Thus, Mr. Urbana's lawyer is in the untenable position of being both a material witness to, and an alleged participant in, a transaction which the jury will learn about at trial.

It would be unrealistic for this court to assume that an attorney, who faces potential liability for the same charges for which his client is standing trial "can vigorously pursue[ ] his client's best interest free from the influence of his own incrimination." *Zepp*, 748 F.2d at 136 (citing *United States v. Salinas*, 618 F.2d 1092 (5th Cir.), *cert. denied*, 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980)). Such an attorney is plainly laboring under a conflict of interest,

---

**15.** This court is mindful of the suspect timing of the revelation and the absence of any evidence to corroborate the allegations. Nevertheless, the court is not in a position to reject the testimony outright. Nothing was elicited at the hearing on the motion to disqualify, perhaps for strategic reasons, rebutting or wholly undermin- ing Patton's testimony. On the record as it has been developed to date, therefore, this court must find that the uncontroverted testimony suffices for *Hobson* purposes, though this court expresses no opinion on the ultimate truth or falsity of the suspect allegations.

for he is "placed in the position of having to worry about allegations of his own misconduct." *United States v. Arrington,* 867 F.2d 122, 129 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989) (perhaps nothing "could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities").

Moreover, "when defense counsel has independent personal information regarding the facts underlying his client's charges ... he has an actual conflict of interest." *Government of Virgin Islands v. Zepp,* 748 F.2d at 136; *see also Arrington,* 867 F.2d at 129 (conflict of interest warranting disqualification where counsel would become a witness to rebut evidence of alleged scheme to keep witnesses from testifying against defendants); *Marren,* 720 F.Supp. at 742 ("[attorney] would be a fact witness to several crucial events that occurred during the course of the conspiracy for which his client was on trial"). Mr. Urbana's lawyer, as an alleged material fact witness to the Jed Baron affair, *might* offer relevant testimony about the incident. And, insofar as the additional allegations about him are false, he can offer testimony severely undermining the credibility of the government's star witness. He can explain to the jury that Patton's version of the events are feigned, and he can inform the jury that Patton went so far as to fabricate allegations of criminality against a prominent lawyer, on the eve of trial, in order serve his own interest. Inasmuch as Mr. Urbana's lawyer can offer testimony about material issues in the case, he is precluded from appearing as trial counsel. MODEL RULE 3.7 (a lawyer may not serve "as advocate at a trial in which the lawyer is likely to be a necessary witness ...").

Mr. Urbana's apparent willingness to waive his right to conflict-free counsel so that he may be represented at trial by his counsel of choice is no answer. This court has wrestled with that alternative from the first moment, and indeed, was prepared to elicit a waiver as to the Jed Baron incident so as to preserve Mr. Urbana's right to counsel of choice. This court also intended to redact all references to Mr. Urbana's lawyer and tailor the case accordingly to insure that Mr. Urbana would receive a fair trial. *See United States v. Pungitore,* 910 F.2d 1084, 1142 (3d Cir.1990) ("the district court should consider the possibility of redacting the attorney's name from trial exhibits and from the indictment if they indicate that the attorney may have been criminally involved in the charged offenses"). However, the recent unveiling of allegations implicating counsel even deeper in the web of charges against his client renders this option unfeasible.[16] In the first place, to redact the testimony to exclude all references to Mr. Urbana's lawyer would be to tamper with the integrity of the jury's fact-finding mission.[17] Moreover, as the Second Circuit has observed:

> If the court had accepted [defendant's] proffered waiver of conflict-free counsel, he would have been represented by counsel encumbered with a strong incentive to conduct the trial in a manner that would minimize counsel's own exposure. This conflict would continue to exist even if all references to [counsel] were redacted from [the witness'] testimony, or if [the defendant] waived the presentation of any direct rebuttal to [the witness'] testimony.

*Arrington,* 867 F.2d at 129.

By no means does the court insinuate that it accepts as true Patton's version of the events. However, this court must en-

---

**16.** Severing Mr. Urbana from his codefendants similarly offers no solution because that would only protect the codefendants, not Mr. Urbana. *See* Defendant Sam Frank Urbana's Proposed Solution (filed Mar. 11, 1991).

**17.** Another alternative to disqualification considered by the court is the wholesale exclusion of the evidence pertaining specifically to the Jed Baron incident and the events which transpired

in the home of Mr. Urbana's lawyer. That evidence, however, is relevant to the government's case, *see Cunningham,* 672 F.2d at 1075, and cannot not be excluded to accommodate a defendant's choice of counsel. *See United States v. Pungitore,* 910 F.2d 1084, 1142–43 (3d Cir. 1990) ("[i]n no case, however, must the government's exercise of prosecutorial discretion yield to the defendant's choice of counsel").

sure that Mr. Urbana is represented by counsel free from actual conflicts of interest. As noted above, such conflicts presently infect Mr. Urbana's relationship with his counsel regardless of the truth or falsity of the accusations. To safeguard Mr. Urbana's right to effective assistance of counsel and a fair trial, therefore, this court must reject any proffered waiver.[18]

## III. CONCLUSION

Federal courts have an interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver.

*Wheat v. United States,* 108 S.Ct. at 1697.

This court finds itself having to choose between the horse nearest the stable door, or no horse at all.[19] Honoring Mr. Urbana's choice of counsel invites "future attacks over the adequacy of the waiver or the fairness of the proceedings in [this] court...." *United States of America v. Dolan,* 570 F.2d 1177, 1184 (3rd Cir.1979), *quoted in Wheat,* 108 S.Ct. at 1698.[20] Disqualifying counsel paralyzes the progress of this trial and invites a later challenge to this court's decision to override Mr. Urbana's qualified constitutional right.

This court appreciates that the practical effect of disqualification is to strip Mr. Urbana of his most penetrating weapon in his campaign against the government's charges. This court also understands that if the allegations concerning his attorney are wholly unfounded, there may be no repairing the damage that will have been done. At this juncture, however, this court is unable to fashion an adequate alternative to disqualification.

Skeptical of the circumstances giving rise to this quandary, this court has taken heed of the Supreme Court's admonition that:

> the government may seek to "manufacture" a conflict in order to prevent a defendant from having a particularly able counsel at his side; but trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision.

*Wheat,* 108 S.Ct. at 1699. Curiously, the government offers little explanation as to how its star witness could possibly have omitted mention of the events which he now swears happened. The government debriefed Patton extensively during the time that Patton was a cooperating witness. Although it is troubling to the court that Patton somehow forgot to discuss in detail the matters pertaining to Mr. Urbana's lawyer, the record before the court does not indicate that the eleventh hour revelation is a subterfuge for constitutional sabotage. With great reluctance, therefore, this court must disqualify Mr. Urbana's lawyer from participating as trial counsel.[21]

---

**18.** In a decision pre-dating *Wheat,* an Eleventh Circuit panel indicated, in *dicta,* that an actual conflict of interest arising from an attorney's alleged participation in the charged crimes could be waived by the defendant. *See United States v. McLain,* 823 F.2d 1457, 1464 (11th Cir.1987) (attorney's failure to advise defendant of actual conflict of interest rendered trial unfair). In an even earlier opinion, however, another panel of the Eleventh Circuit held that in certain circumstances, the trial court need not question each of the defendants once the court determined that it could not accept the defendants' waivers. *See United States v. Padilla-Martinez,* 762 F.2d 942, 948 (11th Cir.1985) (conflict of interest where attorneys retained by unindicted co-conspirator to represent eleven co-defendants). In light of *Wheat* and the plethora of cases rejecting proffered waivers under the

circumstances presented by the instant case, this court has made no attempt to elicit a waiver from Mr. Urbana.

**19.** *See* note 13, *supra.*

**20.** *Cf. Pungitore,* 910 F.2d at 1143 n. 84 ("[t]he district court should not be placed in no-win situation of being confronted with a claim of a Sixth Amendment violation if the defendant is convicted, regardless of whether it has ceded to the defendant's expressed desire to be represented by his conflict-ridden attorney, or has taken it upon itself to disqualify the attorney").

**21.** On the day following the hearing on this motion, this court verbally advised all parties to this proceeding that Mr. Urbana's lawyer would be disqualified and that this memorandum opin-

The trial of this cause is reset for July 29, 1991.

DONE AND ORDERED.

ion would follow. All parties were also in-

formed of the July 29, 1991 trial date.