UNITED STATES of America,

v.

Jacob ORGAD, also known as "Tony Evans" and "Koki," Defendant.

No. 00 CR 1168(JG).

United States District Court, E.D. New York.

March 9, 2001.

Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY by Linda A. Lacewell, Jed Davis, Assistant United States Attorneys, for the Government.

Ronald Richards, Los Angeles, CA, Kerry Lawrence, Briccetti, Calhoun & Lawrence, LLP, White Plains, NY, for Defendant.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

The Government has moved to disqualify defendant's principal counsel, Ronald Richards, from representing the defendant at trial. On February 16, 2001, I issued an order stating that the motion was granted, and that this opinion would follow. Set forth below are the reasons Richards may not appear at trial as Orgad's attorney.

## BACKGROUND

A. *The Los Angeles Indictment*

In April 2000, a grand jury in the Central District of California returned an indictment (the "Los Angeles Indictment") charging defendant Jacob Orgad with operating a continuing criminal enterprise, in

violation of 21 U.S.C. § 848(a), and with committing numerous other offenses relating to the importation and distribution of MDMA, commonly known as "ecstasy." Orgad was arrested at his residence in New York and removed to California, where he retained Richards, an attorney admitted to practice in California.

Trial was scheduled to begin on October 1, 2000, at which time the government stated that it was not ready to proceed. As a result, the district court dismissed the Los Angeles Indictment without prejudice under the Speedy Trial Act. On November 1, 2000, the court converted the dismissal of the indictment into a dismissal with prejudice. Orgad has remained in custody, however, based on an extradition request from France.

B. *The Instant Indictment*

On November 16, 2000, a grand jury in this district returned an indictment charging Orgad with one count of conspiring to distribute and to possess with intent to distribute ecstasy. A superseding indictment, returned on December 8, 2000, added counts charging Orgad with the importation and distribution of ecstasy and a conspiracy to launder the proceeds of the ecstasy distribution.

Orgad arrived in this district in custody on December 14, 2000, and was arraigned the next day on the indictment and the superseding indictment. Richards filed a notice of appearance on that date and appeared on behalf of Orgad. On December 23, 2000, Richards filed an application for admission to appear *pro hac vice*, which I granted orally on February 9, 2001.

A motion schedule that was set on December 15, 2001, called for oral argument of all motions on March 2, 2001. Defendant filed numerous motions, and the government filed the instant motion to disqualify Richards. By order dated January 19, 2001, I directed that two motions would be addressed before all others: defendant's motion seeking my recusal from the case and the government's motion to dis-

qualify Richards. I accelerated the argument of those motions to February 9, 2001.

In a memorandum and order filed on February 16, 2001, I denied the recusal motion.

THE FACTS

The government's motion to disqualify Richards is based upon his interactions, including several tape-recorded conversations, with Jennifer Leary, a government witness who allegedly was an ecstasy courier for Orgad. Leary will testify at trial about her role as a courier and her dealings with Richards, and the government will offer the taped conversations into evidence. The facts giving rise to the government's motion are set forth below.

A. *The Events Leading Up To The Taped Conversations*

Special Agent Tony Chrysanthis of the Drug Enforcement Administration ("DEA") and Special Agent Calvin Sigur of the United States Customs Service are based in California and were the case agents assigned to the investigation and prosecution of the Los Angeles Indictment. During their investigation, they identified numerous young women who, on Orgad's behalf, had traveled from Europe to the United States as couriers, smuggling large quantities of ecstasy. One of these women was Leary; as the investigation progressed, several members of Orgad's organization told the agents that she had been one of Orgad's couriers.

In mid-September of 2000, while preparing for the trial of the Los Angeles Indictment, Agent Sigur contacted Leary, who was working as an exotic dancer in Jacksonville, Florida. He wanted to enlist Leary to cooperate against Orgad. Sigur told Leary that the agents knew she had served as a drug courier and that they intended to serve her with a subpoena to testify at Orgad's trial in California. Leary acknowledged that she had information to provide to the agents in connection

with their investigation of Orgad. Later in September, Sigur and Chrysanthis together informed Leary by telephone that they would like to come to Jacksonville to speak to her. She agreed to meet with the agents for an interview.

After that telephone conversation with the agents, however, Leary spoke with an associate of Orgad in Los Angeles, who urged her to call Richards. On September 29, 2000, Leary did so, and she reported to Richards that the government was interested in speaking to her. According to Leary, she told Richards that she had been a courier for Orgad. She asked Richards whether Orgad "was going to take care" of her. Oral Arg. at 22.[1] Richards (according to Leary) assured her that he would. He also told her that the government had no case against her, and advised her not to talk to the agents, not to answer her telephone, and to move to a place where the agents could not find her. According to Leary, she had additional conversations with Richards, similar in substance to the first, before her meeting with Chrysanthis in late October.

As stated above, on October 1, 2000, the Los Angeles Indictment was dismissed. The sequence of events relating to Leary suggests that the dismissal of the indictment made less urgent the agents' need to speak to Leary. In any event, Chrysanthis did not arrange to go to Jacksonville to interview her until late October.

On October 29, 2000, Chrysanthis was at the airport in Atlanta, on his way to Jacksonville, when he spoke by telephone to Leary to confirm their appointment. From Chrysanthis's perspective, all was well; Leary again expressed her desire to speak to him about Orgad. However, immediately after speaking with Chrysanthis, Leary called Richards and reported that a DEA agent was on his way to Jacksonville.

Subsequent events make it clear that, before October 29, 2000, Chrysanthis had already exerted pressure on Leary to pro-

vide information that would incriminate Orgad. Specifically, Leary was told, in essence, that if she did not meet with the agents and provide such information, she would be arrested and would face the prospect of a lengthy prison term. Leary reported this to Richards.

Richards correctly believed that solid evidence of such pressure would be useful in impeaching Leary if she ever testified against Orgad. See Oral Arg. at 35 ("I am thinking, this is fantastic defense evidence"). He also believed, incorrectly, that the agents' approach to Leary— cooperate or face the prospect of a long prison term— was improper or perhaps even illegal. In fact, the agents, who had ample reason to believe that Leary had been a courier for Orgad, were merely using the tools Congress and the United States Sentencing Commission gave them. See 18 U.S.C. § 3553(e) and U.S.S.G. § 5k1.1 (requiring government motion before a sentencing court can sentence a defendant below mandatory minimum sentence and guideline range, respectively, based on defendant's "substantial assistance" to the government). In any event, for both of these reasons, Richards decided to get the agents on tape. According to Leary, Richards told her to call back Chrysanthis and tell him that she did not want to meet with him because she knew nothing about drug trafficking. Leary agreed to have Richards place the call, stay on the line as a silent witness, and record the call.

B. *Leary's October 29, 2000, Conversations With The Agents (Recorded By Richards)*

When Leary called back Chrysanthis, he was still in Atlanta, waiting for his connecting flight to Jacksonville. Leary told him not to come. She said she had spoken to a lawyer and that there was no reason for her to talk to the DEA. She denied being a drug courier. Chrysanthis responded by saying that he would return to

---

1. "Oral Arg." refers to the transcript of the    oral argument on February 9, 2001.

Los Angeles, obtain an arrest warrant, and have her arrested. He reiterated that a large number of other couriers had implicated Leary as a courier of ecstasy from Paris.

Chrysanthis told Leary that she was in the "big leagues;" if she "played ball" with the government, it could mean the difference between a sentence of probation and a minimum of ten years in prison. Tape A at 5.[2] He gave her two choices: provide information to the government about ecstasy smuggling or be arrested within days.

That Leary had done an about-face since her conversation with Chrysanthis minutes earlier was apparent. Chrysanthis said, "I don't understand why all of a sudden you've changed, you've changed your tune." Tape A at 6. Leary responded that it was because she didn't "want to deal with this." Tape A at 6. Chrysanthis explicitly told Leary, with Richards listening, that the DEA was interested in Leary's cooperation against "people above you." Tape A at 7. After reiterating his threat to arrest Leary if she refused to meet with him, Leary agreed to call Chrysanthis the following day.

Richards's tape recording then includes a conversation between him and Leary, in which Richards convinced a confused and pliant Leary to call Chrysanthis back one more time to, as Richards put it, "see if you can convince him, uh, that you have no information that's relevant for him." Tape A at 10. However, Richards failed in his effort to reach Chrysanthis, who had left Atlanta for Jacksonville. So Richards dialed Agent Sigur. In a lengthy conversation, which Richards again listened to and recorded with Leary's consent, Leary reiterated her insistence that she knew nothing about ecstasy smuggling. Sigur told

her that numerous others had implicated her in Orgad's ecstasy smuggling, and that she would be arrested if she did not cooperate immediately. He also repeatedly urged Leary to get an attorney if she did not have one already.

Sigur further told Leary that the government was not interested in couriers, but rather was focusing on the head of the organization, "Koki."[3] Sigur urged Leary to "come to the winning side." Tape B at 10, 14. He promised nothing, but told her he would tell the prosecutor that Leary had accepted responsibility and had simply "made a mistake," Tape B at 11, and that the prosecutor would tell that to the judge. Sigur emphasized to Leary that in her conversation the next day with Chrysanthis she should have an attorney, because "we don't have your best interest in mind." Tape B at 12. He stated that the government was in a "trial mode" against "the head of this organization." Tape B at 12. He mentioned numerous other couriers who had been arrested, and proffered his view that Leary was a minor player. He said the agents wanted to give her the "opportunity" to help herself out by cooperating against those who are "more responsible." Tape B at 14.

## C. Leary Agrees to Cooperate Against Orgad and Richards

Leary next saw Chrysanthis on October 31, 2000, when he showed up at her place of employment, a Jacksonville strip club. Chrysanthis had some local law enforcement officials with him. He asked Leary if she would speak to him outside the club. She agreed, and told him once again that she had no knowledge of any criminal wrongdoing. Chrysanthis assured her that she would be arrested and left. The locals promptly arrested her on some kind of public morals charge. She was taken

2. "Tape A" will be used to refer to the transcripts of Leary's conversations with Chrysanthis on October 29, 2000, at 7:22 p.m. and 7:45 p.m. "Tape B" will be used to refer to the transcript of her telephone conversation with Sigur on October 29, 2000, at 8:27 p.m.

3. It is undisputed that Orgad's nickname is "Koki." The spelling is provided by the parties; the nickname is pronounced "Cookie."

into custody, but she made bail and was released that same night.

Before he could leave Jacksonville, Chrysanthis received a telephone call from Leary's roommate, who told Chrysanthis that Leary wanted to cooperate. Chrysanthis met Leary as she was released from custody and brought her to the DEA office in Jacksonville. Leary admitted that she had been a courier for Orgad. She attributed her contrary statements on October 29 to the influence of Richards. Specifically, she said she had been acting on the advice of Richards when she denied having knowledge of criminal activity. She agreed to cooperate with Chrysanthis.

Chrysanthis saw in these circumstances reason to suspect that Richards had tampered with a potential witness against Orgad. He wanted to pursue that suspicion by having Leary contact Richards and tempt him to tamper with her further, on tape. Recognizing the sensitivity inherent in investigating his main target's attorney, Chrysanthis discussed the matter with his supervisor and with the Assistant United States Attorney handling Orgad's California case. They authorized him to proceed.

D. *The October 31—November 1, 2000 Conversations With Richards (Recorded By DEA Agents)*

Now cooperating with the agents instead of Richards, and no doubt at the direction of those agents, Leary importuned Richards to commit a crime. She did not come right out and say that, but from the outset there was nothing subtle about her approach:

> JL: Um, what's going on? I mean, it, *are you gonna, is Koki gonna take care of me?* I mean, I did stuff for him, you know. I mean, what's going on? I don't understand. I mean, *are you gonna do anything for me?* ... [Chrysanthis] told me that he was

gonna put me in jail for a long time if I don't cooperate and I don't know what to do.

Tape 1 at 4.[4]

Richards took the bait, and had four conversations with Leary over a 29–hour period that require his disqualification from the trial of this case. A reasonable person could conclude that their conversations establish a number of facts that may prove damaging to Orgad at trial.

1. *Richards Knew That Leary Was Orgad's Courier*

During Leary's recorded conversations with the agents on October 29, 2000, Richards learned that the government believed that Leary was one of numerous couriers in Orgad's ecstasy enterprise. In Leary's recorded conversations with Richards, she repeatedly told him the same thing. *See* Tape 1 at 4 (JL: "What a, what about the things, you know, I did for Koki"); Tape 1 at 7 (RR: "I mean, you keep saying the things you did for Koki. I mean, it was my understanding that you, that you never did anything."); Tape 2 at 5 (JL: "I want you to know that I did, um, bring some ecstasy bags for Koki").

2. *Richards Knew · The Government Was Soliciting Leary's Cooperation*

It was obvious from the October 29th conversations that the DEA wanted Leary to cooperate against Orgad. In her recorded conversations with Richards on October 31 and November 1, Leary repeatedly told him that she was still being pressured by the agents to admit her guilt and cooperate with the government. *See* Tape 1 at 4 (JL: "He told me that he was gonna put me in jail for a long time if I don't cooperate and I don't know what to do."); Tape 2 at 12 (JL: ... "they were

---

**4.** "Tape 1" refers to the transcript of the conversation on October 31, 2000 at 11:15 p.m. "Tape 2," "Tape 3" and "Tape 4" will be used to refer to the transcripts of the tele-

phone calls on November 1, 2000 at 12:00 p.m., November 1, 2000 at 12:45 p.m., and November 1, 2000 at 4:30 p.m., respectively.

just telling me ... if you work with us we'll give you a, you know, a good deal.").

### 3. *Richards Attempted to Gain Leary's Trust*

Although he was counsel to Orgad, the principle person against whom Leary would provide cooperation, Richards endeavored to convince Leary that she should place her faith in him. *See* Tape 2 at 7 (RR: "Okay, well listen, I mean I know you don't know me but you're just gonna have to trust me that I'm not gonna fuck you over."). At one point, after admonishing Leary not to speak to the agents, Richards said:

RR: But listen, on, on a separate note, I'm a very nice guy. I, I told you we're very close in age. How old are you?

JL: I'm twenty four (24).

RR: Okay, I'm eight (8) years older than you, okay.

JL: Yeah.

RR: I'm not. I'm old—I, I sound older on the phone—

JL:—yeah—

RR:—than I am.

JL: Yeah, yeah.

RR: I'm a very young hip lawyer. I know what I'm doing. I just want you to relax. I mean, I just, I'm trying to make this as easy as possible for you, but you have to understand—

JL: I understand.

RR:—that, that, that I'm not bringing this upon you.

JL: Okay, okay.

RR: You know, and then, and then, and then. If, if you want to. You know, if you want to uh, if you want to um—

JL: I just want it taken care of. You know what I'm saying and—

RR:—that's what I'm trying to help you out with.

Tape 2 at 26. Richards concluded that conversation on a similar note:

RR: Okay, I'm not going to abandon you or screw you over, I promise.

JL: Okay.

RR: Because, I don't want to prosecute you.

JL: Okay, I understand that.

RR: Okay, I'm not here to hurt you.

JL: Okay.

RR: I'm a very sensitive individual.

JL: Okay.

RR: Okay so, are—do you feel better now?

JL: I do feel better.

RR: Okay good, alright.

Tape 2 at 30.

### 4. *Richards Told Leary She Did Not Need To Cooperate Because There Was No Case Against Her*

Confronted with a person who claimed to have committed crimes for his client and who was feeling pressure to cooperate, Richards sought to relieve the pressure. He assured her that the mere fact that other couriers might have given her name to the agents was no reason to cooperate:

RR: That's what I'm trying to help you with, if, if, I, I know this case inside and out and your name has never come up in this case.

JL: Okay.

RR: Don't. You know, the fact that some girl said you brought, I mean, I, I—

JL: Well they said a couple of people, a couple of girls. You know—

RR:—and how would, do you know how they would know that?

JL: Probably, I, I don't know.

RR: I mean how would someone know what you did?

Tape 2 at 6–7. *See also* Tape 2 at 8 (RR: "you got to realize ... you can't go jump-

ing up and back between wanting to cooperate and incriminating yourself ... versus wanting to just finish your case ... you got to realize, you're being lulled into a lot of bluffing right now."); Tape 2 at 9 (RR: "So just because the government says that you did something illegal, doesn't mean I'm going to believe them.... I mean, does that make sense to you?"); Tape 2 at 25 (RR: "Did they have any information on you? Did they catch you with anything?" JL: "No. They had pictures of me, you know." RR: "Okay, so what?").

### 5. Richards Told Leary To Stop Saying She Was A Courier

Richards's theme with Leary was that the only witness to her being a drug courier was herself, so she should be quiet about it. When Leary explicitly told him that she carried·ecstasy for Orgad, Richards said:

RR: You know, I don't have any information that you did that, so—

JL: Yeah, I'm just gonna—

RR:—you don't, you don't need to invent anything to me.

JL: Okay.

RR: For me to believe you or not to believe you, I, I.

JL: Well I'm just telling you cause that's why I'm scared. You know.

RR: Well, I, I, I realize that there's no, there's nobo—there's nobody in, the only one that can prove it, is yourself.

JL: Yeah.

RR: And, and, and, and, and you know, I'm not gonna ask you those questions cause I'm not here to prosecute you.

Tape 2 at 5–6. *See also* Tape 1 at 7 (RR: "I mean, you don't need to sort of imply like you did something so you can get something. I mean it's not necessary."); Tape 2 at 6 (RR: "I know this case inside and out and your name has never came (sic) up in this case."); Tape 2 at 23 (RR: "See you keep giving [the agents] way too much information voluntarily").

### 6. Richards Advised Leary That Cooperation Was Not In Her Best Interests

Not content with merely attempting to persuade Leary that the government had no case against her, Richards sought to convince Leary that cooperating with the government was not in her best interests. He suggested, falsely, that she would receive no benefit from cooperation if Orgad's motion to dismiss the Los Angeles Indictment with prejudice were granted:

RR: Well, do you know what working for them means?

JL: I have no idea, that's.

RR: Okay, well, I'm going to explain that to you.

JL: Okay.

RR: That means that you would have to plead guilty, to uh, uh, importing a controlled substance and then you would have to, come to Los Angeles and testify in a trial if there ever was one.

JL: Mm-hm.

RR: I mean, now the judge might grant the motion and then there will be no trial and then you would have pled guilty for nothing.

JL: Yeah.

RR: So you got to just slow down and, and not panic, that's why I'm. This is what I want to focus on in this phone call, is how do I stop you from panicking. Like what would be the safest way for you not to be around there. What, what could we do so you're not panicked anymore.

JL: I, I mean, if you, if it's better, um, for you just to send me a ticket or something.

RR: Okay great, why don't we start with that. I will send. What airport

do you, is it convenient for you to fly out of?

Tape 2 at 12–13. *See also* Tape 1 at 8 (RR: "Well, um, when he said give you a good deal, what did he mean by that? ... Let me just try to walk you through this. If you admit that you were involved in a crime, you're gonna have to plead guilty to a felony narcotics sale, you know, or importation. You're gonna be registered as narcotics offender the rest of your life and you're gonna be on federally supervised, uh, release. Simply because he told you that he has information. That's why I think you're better off coming out here, seeing a lawyer and realizing that if you don't say anything or incriminate yourself.").

7. *Richards Persuaded Leary To Come To California, For Various Reasons*

Richards was relentless in his effort to get Leary to California. *See* Tape 1 at 8 (RR: "I think you're better off coming out here ..."); Tape 1 at 9 (RR: "...do you want to come to California? ... I can help you more if you're in California, because that's where I'm at."); Tape 1 at 9 (RR: "Do you want to come to California?"). *See also* Tape 2 at 22. The tape recordings reveal that Richards had multiple reasons for his insistence.

a. *So Richards Could Talk Without Fear Of Being Tape Recorded*

Richards is not naive. He knew that Leary could well be cooperating with the government as she spoke to him by phone. As discussed *infra*, he sprinkled disclaimers throughout the conversations for that very reason, although they were for the most part transparent. One reason Richards wanted Leary to come to California was so he could speak to her more forthrightly than he could over the telephone.

That Richards was worried he was being taped was explicit:

JL: ...there's no way that you can hide me from them?

RR: [Laughs].

JL: I mean, cause—

RR: ... the way you're putting this, you know, I can never, the, the way you're, you know, the way you're putting all this, you got to understand, that there's no way, if there's a warrant out for you—

JL:—no. There's not one. [UI] I mean, but I just don't want to deal with them. You know what I'm saying?

RR: No, I, I realized that, if I can. You know, if you could, if you come out here, um, if you come out here. You know, all I can tell you. You know, you got to realize, *you're calling me from a phone, I have no idea if uh, you know, fifty agents are sitting next you—*

JL: Yeah.

RR: —*right now, so, so I'm not going to tell you, I'm not going to.*

Tape 2 at 10 (emphasis added).

Richards repeatedly referred to his desire to be able to speak more freely to this potential witness against his client. *See* Tape 2 at 11 (RR: "So, once you get out here, we can, you know, I say, develop more of a rapport with each other, but over the phone, three thousand miles away... it is very difficult"); Tape 2 at 24 ("...once you come here I can facilitate you doing whatever you want. It's much easier than talking to you on the phone in Jacksonville.").

b. *So Richards Could Arrange For Leary To Be Represented By A Member Of His "Infrastructure"*

Despite his leeriness, Richards had numerous moments of almost startling candor in his conversations with Leary. For example:

RR: Okay, you need a lawyer to be a buffer between you and them. And so the only way I can get you a lawyer is if you come here, then I can get you a lawyer.

JL: Uh-huh.

RR: And once I get you a lawyer, then the next question is, um, you're worried about getting arrested. Well,—

JL: Mm.

RR: you know, they'd first have to find you . . .

Tape 1 at 10. At that point, the key to dealing with Leary, according to Richards, was to get Leary to Los Angeles, because Los Angeles was where his "infrastructure" was:

RR: I, I understand you're scared, and, and what I'm trying to tell you is, is that, I'm not going to abandon you, I would, I, I, but without you being in L.A., I have no infrastructure—

JL: Okay.

RR:—where you are now, to assist you.

JL: Right.

RR: You know, I, I don't know any lawyers and the, the two lawyers that I called up there to represent you are morons in Jacksonville.[5]

Tape 2 at 12.

### c. So The "Infrastructure" Lawyer Could Keep Leary From Cooperating

In theory, separate counsel would advise Leary with only her best interests in mind. But Richards made it clear that he would have a role in that representation, and that the advice to Leary would be to reject the offer of cooperation: "You know, I can get you, a way to come out to California, if you were here and you had your own attorney, *at least between the two of us* it would be very difficult for someone to get you, to

scare you into doing something." Tape 2 at 4 (emphasis added).

Though professing at one point that "I can't tell you not to talk to" the agents,[6] in the same breath Richards told Leary that the lawyer Richards would assign to her would give her that advice:

RR: I can't tell you not to talk to them.

JL: Okay.

RR: You know? *But, but if you have a lawyer, the lawyer can tell them we are not giving any statements so pound sand.*

JL: Okay, and—

RR: . . . so that's. You know, you just got to realize that, until you get here, I can't have anybody as a lawyer to see you because, um, you know, the, they're all in Los Angeles.

Tape 2 at 24 (emphasis added). *See also* Tape 2 at 22–23 (in response to Leary's statement that she will need to know what to do when the agents contact her, Richards states: "but they're not going to talk to you again . . . That's what I keep telling you . . . You're gonna have a lawyer. He's gonna tell you what to do.").

### 8. Richards Advises Leary To Avoid The Government In The Meantime

Part of the money Richards would send to Leary, *see infra*, was for her to obtain a new cellular telephone. Richards told Leary "Don't give the number out to anybody . . . If you start calling people in Jacksonville, they'll, they'll find you in two minutes." Tape 3 at 4. Richards had previously admonished Leary for making herself too "accessible" to the agents, Tape 2 at 14, that she was "like a sitting duck," Tape 1 at 9, and that she should move out

---

**5.** Unbeknownst to Leary, Richards had tried to arrange for a lawyer to represent her in Jacksonville. He contacted two lawyers listed in the directory of a national defense attorney association, and told them the government was trying to pressure someone "who ha[d] nothing do with" Orgad to cooperate against him. Oral Arg. at 33–34. When the lawyers

refused to meet with Leary and give her advice for free, Richards dismissed them as "morons." *Id.* Leary neither met them nor knew of Richards's efforts. *Id.* at 23, 34.

**6.** In fact, as described *supra*, Richards told Leary not to talk to the agents.

of her apartment. Tape 2 at 16. After she received the money Richards wired to her, Richards told Leary: "you stay incognito ... don't, do not, you know, go places you normally go ... if you're worried about something." Tape 4 at 2–3.

### 9. *Richards Sent Leary Money To Prevent Her Cooperation*

Richards does not dispute that he sent Leary money. His machinations with respect to the justification for the payment and the manner in which it was sent suggest that he was trying to purchase Leary's silence.

#### a. *The Fabrication Of A Justification For The Payment*

Initially, the purported reason for sending money to Leary was to pay for her travel to California so Richards could "help" her:

RR: ... would it be helpful if I um, had uh, one of your friends like Western Union you something?

JL: Western Union me what?

RR: Some money.

JL: Um.

RR: For you, if you need to travel.

JL: I guess if you want to go ahead and, uh, arrange some travel.

Tape 2 at 3. However, the ostensible purpose of the wired money soon became the need to pay Leary's rent:

JL: Right now for that thing, for me to be in jail last night cost me, uh, some money. You know, I was just, to make some money for my rent, and now I can't because of that. You know?

RR: How much is the rent?

JL: It was three hundred ($300) ... I mean, would you be able to send me some money Western Union just for the rent for right now, until, you know.

RR: I'm happy to.

Tape 2 at 15.

Richards thereupon latched on, at least temporarily, to the notion that he was sending Leary rent money. Tape 2 at 19 (RR: "Okay, so I'm gonna send you the Western Union for your rent ... so you'll have some rent."); Tape 2 at 26 (RR: "I'm going to send you this money so you can have some money for rent.")

There were problems with the notion that the money was for Leary's rent. One was the specter that, because Leary would be coming to California, she would not be paying the rent anyway. Tape 2 at 16 (RR: "Why don't you move out after this so you don't have that rent expense?"). Another was the fact that the amount actually sent ($500) exceeded the amount of the supposed rent ($300). Finally, by the time it was sent, the money was for "rent and shit," Tape 3 at 2, the latter category including, *inter alia,* the new cellular telephone that Richards wanted Leary to get. Tape 3 at 4 ("But okay, so what I'm gonna do is I'm gonna send you five hundred now and you're gonna call me at two, and you'll get a new cell phone and then we'll [UI]. Don't give the number out to anybody.").

The bigger problem with the "rent" story was Richards's apparent realization that, if this day came, he would be hard-pressed to justify sending rent money to a prospective witness against his client, even if it were actually to pay rent. This realization, and the final metamorphosis of the purpose of the payment to Leary, is captured on the tape. Seconds after describing himself as a "very hip young lawyer," Richards demonstrated his legal acumen by thinking out loud, eventually alighting upon his final justification for sending money to an adverse witness:

RR: I mean, I mean, forget about. I mean, we're going to get, I'm going to send you this money so you can have some money for rent.

JL: Okay.

RR: I'm going, I'm going—

JL: Thank you.

RR:—I'm going to take care of this but you just got to slow down and um, you know, realize that uh, [sniff] that, that none of this is, um, you know, none of this is, uh, let me see what I'm trying to tell you here so, so, so we can have, uh, so we can have, um, so we have a situation here. [UI]. I mean let me just focus my thoughts for a minute.

JL: Okay.

RR: One is, that, that I'm giving you this money because you need some money to travel to come out here to possibly assist me in this case.

JL: Yeah.

RR: Okay, so, so, I, I want you to understand that. Number two, as a person. I'm just trying to help you because I see you're scared.

Tape 2 at 26–27.

So the rent money story was abandoned, and the travel money story was readopted. This is Richards's final story on the tapes, and on this motion he is sticking to it; he indignantly defends his payment to Leary as an "advance for expenses and reasonable compensation for loss of time to a witness to travel to the location of the hearing." Brief for Orgad, at 7.

There are serious problems with this story as well. First, there was no "hearing," or any other proceeding, for Leary to travel to. As Richards himself put it while arguing a different point, "[t]here wasn't even a case pending." Oral Arg. at 67. Second, even if there were something pending, Richards was plainly interested only in making Leary *inaccessible* to the government, not in producing her in court. Third, even if there were a pending proceeding, and even if Richards wanted to produce Leary at it, the $500 was still not for travel expenses, as Richards himself stated on the tape. He told Leary that he would take care of those expenses sepa-

rately by purchasing the airline ticket (which Leary would pick up at the airport), and by picking Leary up at the Los Angeles airport. *See, e.g.,* Tape 3 at 3 (RR: "I'll send you . . . Can I send you five hundred [$500]?" JL: "That's fine." RR: "And then, and then we'll just take care of your travel airfare here.").

Indeed, the fact that Richards was really sending the money for reasons other than advancing travel expenses became explicit. As mentioned above, Leary was to use part of the money to obtain a new cellular telephone. Also, in the phone call confirming that the money had been received, Richards revealed both his true belief that the money had nothing to do with advancing travel expenses and his understanding that Leary posed a "problem" for Orgad:

JL: . . . I finally got it.

RR: Oh, good. Well, they didn't give you a problem, did they?

JL: No, they didn't.

RR: Oh, okay. Good

JL: I got it alright.

RR: Okay, so that *should solve our short, our, your short term problem.*

JL: Yeah, for right now. Um, yeah, uh, I'm gonna give you a call on, uh, another phone within another, a day um, whenever I get my new, I get a new phone.

RR: Okay, great.

JL: Alright?

RR: Okay, so you stay incognito . . .

Tape 4 at 2 (emphasis added). Leary had previously told Richards that she could not travel for "at least two days." Tape 3 at 5. What Richards described as "our, your short term problem" had nothing to do with travel expenses. It had everything to do with the fact that a prospective witness against Orgad, who was being pressured by federal agents to cooperate, was asking Richards for money.

b. *The Concealment Of The True Identity Of The Sender Of The Money*

Casting further doubt on the legitimacy of his payment to Leary, Richards conducted the transaction in a manner designed to disguise the source of the funds.

(i) *Who is Helping Leary?*

The deception regarding the source of the funds began with a charade that was eventually abandoned entirely: that the money originated with some unspecified "friends" of Leary in Los Angeles. At the outset, Richards adhered firmly to this fiction. When Leary first asked for money, Richards said: "[Y]ou have other friends in Los Angeles besides Koki that told me that they wanted to help you out." Tape 1 at 7. *See also* Tape 2 at 3 (RR: "Would it be helpful if I ... had one of your friends like Western Union you something."); Tape 2 at 4 (RR: "I didn't know, you said you were broke, so I could, a lot of friends of yours, but they said that they could loan you some money.") Tape 2 at 4.

Richards did not explain why Leary's friends would flock to Orgad's lawyer in order to help Leary out. When pressed ever so slightly on the subject by Leary, Richards's fumbling response revealed the implausibility of the notion that the money was coming from anyone but Richards:

RR: I promise you that if you come here, you'll have, I'll help you to get an attorney to represent you, so you're not alone, so you have someone fighting for you.

JL: Yeah.

RR: Okay. Number three, if you need—

JL:—my friends or Koki's friends?

RR: No, your friends. They didn't identify themselves to me as Koki's friends—

JL: Mm-hm.

RR:—as Koki's friends. My client—

JL: Mm-hm—

RR:—has nothing to do with helping, with the respect to, you know, I, I mean maybe they're helping you because they, I, I don't want to speculate as why—

JL:—yeah.

RR:—they on, only they would help you.

Tape 2 at 7–8. In any event, by the third taped conversation between Leary and Richards, all pretense that the financial assistance was coming from Leary's "friends" was abandoned in favor of Richards's idea that he was "advancing" her travel funds so she could "travel to the location of the hearing." Brief for Orgad at 7.

(ii) *The Use Of A False Name To Transfer The Funds*

Even after Richards abandoned the pretense that Leary's "friends" would send her the money, and no doubt as a hedge against the dubious propriety of the payment, he decided to conceal his identity as the sender of the funds. At first, when asked by Leary if he would send her money in his own name, Richards said "Yeah, probably." Tape 2 at 16. But he soon thought better of it:

RR: ...okay, as far, as far as the sender, I'm gonna put your mom down as the sender.

JL: Okay.

RR: Okay, what's your mom's name?

JL: It's [redacted] Leary

RR: [redacted] Leary. Perfect. That will be the sender.

Tape 2 at 20–21.

It later occurred to Richards that he should disguise not only his identity as the sender, but Leary's as the recipient. Thus, he began their third conversation with the suggestion that he send the money to Leary's roommate:

RR: I was gonna, I was gonna ask you if you wanted me to send it to your friend instead ...

Tape 3 at 2. Leary agreed and asked for $1,000, $700 more than Richards had previously agreed to pay her. Tape 3 at 2. They compromised on $500. *See* Tape 3 at 3 (RR: "Can I send you five hundred?" JL: "That's fine." RR: "Is that enough?"). As it turned out, Richards in fact used Leary's mother's name, instead of his own, to send the money, but used Leary's name as the recipient. Oral Arg. at 29–30.

10. *Richards's Strained Protestations of Innocence*

As mentioned above, Richards was explicit in his concern that agents might be taping Leary's conversations with him, just as he had taped her conversations with them. He therefore littered the conversations with statements such as:

- "You know, talk to the other side, I don't, I don't want, you know, I don't want in any way to be construed that, that, that some how I'm in any way preventing you from going in and cleansing your soul with the government." Tape 2 at 6.
- "there's a few things, you can even write them down if you want to be sure, one thing is, my client is adamant that he's never done anything illegal with you nor asked you to do anything illegal." Tape 2 at 7.
- "You know, I just was calling uh, another lawyer to make sure, you know, that this all was kosher." Tape 3 at 2.

The government suggests that these self-serving statements fall into the "doth protest too much" category, an argument that has considerable force. Also, occasionally Richards simply could not help himself, and his baser instincts intruded directly on his efforts to appear innocent. For example, his pontification that it would be illegal for him to shelter Leary was immediately contradicted by his assurance that he would "facilitate" her disappearance; his nod to the rule that he could not advise her not to speak to the agents was trumped in the same breath by his assurance that he would supply her with a lawyer who would do exactly that:

RR: See you keep giving them way too much information voluntarily, and I am precluded just like they are also precluded—

JL: Well, I just—

RR:—from telling you not to.

JL: Yeah.

RR: See you got to understand something, one thing I can't do, I can't tell you, if there's a warrant, I'm gonna have you—shelter you or avoid you. That's illegal.

JL: Yeah.

RR: *But if you, if you are on your own, just want to disappear, you're an American citizen. You can go wherever you want.*

JL: Yeah.

RR: You know? *And so I'm saying, but once you come here I can facilitate you doing whatever you want.* It's much easier than talking to you on the phone in Jacksonville.

JL: Okay.

RR: Second of all, I can't tell you not to talk to them.

JL: Okay.

RR: You know? *But, but if you have a lawyer, the lawyer can tell them we are not giving any statements so pound sand.*

JL: Okay, and . . .

RR: So that's, *you know, you just got to realize that, until you get here, I can't have anybody as a lawyer to see you* because um. You know, the, they're all in Los Angeles

Tape 2 at 23–24 (emphasis added).

## DISCUSSION

A. *The Qualified Right to Counsel of Choice*

The Sixth Amendment to the Constitution provides that "[i]n all criminal prose-

cutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The right to counsel "was designed to assure fairness in the adversary criminal process." *Wheat v. United States,* 486 U.S. 153, 158, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (citing *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)). The focus of Sixth Amendment claims, therefore, is on the " 'adversarial process, not on the accused's relationship with his lawyer as such.' " *Wheat,* 486 U.S. at 159, 108 S.Ct. 1692 (quoting *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)).

The right to counsel includes the right to be represented by counsel of choice, *see Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932), but that is not an absolute right: "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159, 108 S.Ct. 1692.

A defendant's right to be represented by counsel of choice is limited in part because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692; *see also United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). Thus, the presumption in favor of allowing a defendant to be represented by counsel of choice can be overcome by a showing that the chosen attorney has an actual conflict of interest or a potentially serious one. *See Wheat,* 486 U.S. at 164, 108 S.Ct. 1692; *Locascio,* 6 F.3d at 931. Indeed, the Supreme

Court in *Wheat* explicitly endorsed the disqualification of counsel "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exist which may or may not burgeon into an actual conflict as the trial progresses." *Wheat,* 486 U.S. at 163, 108 S.Ct. 1692. The Court further recognized that deciding motions to disqualify counsel necessarily requires considerable conjecture by trial courts:

> Unfortunately for all concerned, a district court must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

*Id.* at 162–63.

Because of the courts' independent interest in the integrity of judicial proceedings, there are several situations in which disqualification of counsel may be appropriate despite a defendant's willingness to waive the right to conflict-free counsel. For example, a chosen attorney may be disqualified when he ought to be called as a witness for his client, *see, e.g., Locascio,* 6 F.3d at 932–33; *United States v. Castellano,* 610 F.Supp. 1151 (S.D.N.Y.1985), or when counsel could become an unsworn witness for the accused at trial. *See Locascio,* 6 F.3d at 933–34; *United States v. Arrington,* 867 F.2d 122, 129 (2d Cir.), *cert. denied,* 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989). An attorney also may be disqualified when there is a risk that a vigorous defense may reveal illegal conduct by the attorney. *See United States v. Cancilla,* 725 F.2d 867 (2d Cir.1984). Another type of disqualifying conflict may arise due to defense counsel's prior representation of a government witness, *see*

*United States v. Iorizzo,* 786 F.2d 52 (2d Cir.1986), or current representation of a co-defendant. *See Wheat,* 486 U.S. at 159–60, 108 S.Ct. 1692.

■ In the instant case, multiple conflicts of interest, both actual and potential, warrant the disqualification of Orgad's counsel of choice. Orgad's expressed (through Richards) desire to waive his right to conflict-free counsel is immaterial, as the number and depth of the conflicts in this case lead me to conclude that the representation of Orgad by Richards at trial would pose too great a threat to the Court's institutional interest in the integrity of the trial itself. *See Wheat,* 486 U.S. at 162–63, 108 S.Ct. 1692.

B. *The Conflicts In This Case*

1. *Richards Ought to be a Witness for Orgad*

Except in limited circumstances that I shall address below, a lawyer may not serve as an advocate in a case where "it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client." New York Code of Professional Responsibility DR 5–102(C).[7] If Richards ought to be available at trial to rebut the testimony of Leary, he cannot appear as counsel for Orgad.

In this respect, this case is similar to *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984). In that case, Sweeney, a lawyer, was charged with, *inter alia,* conspiring to impede the perjury trial of an alleged coconspirator. *Id.* at 1065. The government claimed that he had obstructed the trial by destroying evidence, including some envelopes that Sweeney's firm's receptionist, Gay McCreery, had typed. McCreery had been called to testify at a pretrial hearing

in the perjury case, and had testified that she was unable to locate the envelopes. *Id.* at 1067–68.

Before Sweeney's trial, the government stated that McCreery would testify that she had a conversation with Sweeney's lawyer, Michael Kennedy, before the aforementioned pretrial hearing. McCreery's testimony would be as follows:

> Mr. Kennedy told me that I would probably be questioned about the envelopes. I was not to worry about the envelopes, the envelopes were safe. The envelopes are his responsibility they were not my responsibility. He then said that the government had not been helpful to them, and if the government wanted the envelopes they would have to find them.

*Id.* at 1068. In affirming an order disqualifying Kennedy from representing Sweeney at trial, the Second Circuit stated, *inter alia,* as follows:

> If McCreery's testimony is admitted at trial, it requires no leap of the imagination to conclude that Kennedy ought to be a rebutting witness, either to deny the conversation, or to provide an innocent explanation for the jury to consider. If Kennedy were to be sworn as a witness it is clear that he should not serve as trial attorney.

*Id.* at 1074. As the court observed, even if Kennedy were to admit that the conversation with McCreery had occurred, he might offer "a perfectly innocent explanation" of his statement that the envelopes were "safe." *Id.*

The same situation exists in the case before me. Although Richards has not denied that he had the conversations with Leary, he has offered various innocent explanations of those conversations that the jury should consider. Indeed, there are

---

7. The local rules of the United States District Court for the Eastern District of New York adopt the New York Code of Professional Responsibility as the general code of conduct for attorneys appearing in our courts. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Local Civil Rule 1.5(b) (providing that discipline may be imposed upon any attorney found to have violated the New York code "[i]n connection with activities in this court").

numerous respects in which unconflicted counsel for Orgad might find it useful to elicit Richards's testimony at trial. Some pertain to the details of the evidence on the tapes. For example:

- The tapes suggest that Richards used Leary's mother's name when sending money to Leary because Richards wanted to camouflage an unlawful payment to a prospective witness. However, Richards denies that, and asserts that he used that name merely to ensure that Leary's mother could retrieve the money from Western Union if Leary were arrested. Oral Argument at 52.[8]

- Whereas the tapes suggest that Richards wanted to assign to Leary a lawyer who would do Richards's bidding, *i.e.*, a member of Richards's Los Angeles "infrastructure," Richards claims that all he meant was that he would help Leary by providing some names of lawyers in Los Angeles. Oral Arg. at 49.

- Richards concedes that it would have been unethical for him to send Leary money to purchase a new cellular telephone. Oral Arg. at 43. He further concedes that the jury could reasonably conclude from the tapes that Richards did just that. *Id.* Yet he denies that he sent the money for that purpose. *Id.* at 44.

- Richards asserts that various friends of Leary's actually offered to send her money through Richards, *i.e.*, that such talk on the tapes was not a ruse

to camouflage what was really the offer of a bribe, an inference the tapes support. *See* Oral Arg. at 73–75.

Richard's testimony also might prove useful to Orgad with respect to the "big picture" of the Richards–Leary interactions. Although Orgad does not contest the government's assertion that Richards's statements are admissible against Orgad pursuant to Fed.R.Evid. 801(d)(2),[9] Richards asserted at oral argument that Orgad was unaware of Richards's conversations with Leary. Oral Arg. at 67. Thus, Orgad may wish to contend at trial that Richards was a young, inexperienced lawyer who made errors in judgment that should not be held against Orgad even though they were made on his behalf. To the same effect, Orgad may wish to elicit Richards's testimony that his goal was not to tamper with Leary, but rather to gather evidence of the agents' pressuring of her. *See* Oral Arg. at 45.

Although Orgad has not explicitly offered to forego having Richards available to testify at trial, for several reasons it would not matter to me if he did. First, when the rebuttal testimony available from counsel is as potentially significant as Richard's is here, the decision to forego it cannot rationally be made in advance of trial. Trials take on lives of their own, and how the evidence will unfold is notoriously difficult to predict, especially in criminal cases, where pretrial discovery is far less expansive than in civil cases. Whether Richards should be called to testify for Orgad will be a tactical decision that will

---

8. It is not apparent to me why, if Leary had been arrested (and thus would have had her "travel" expenses paid for by the government), it would have been ethical to allow Leary's mother to obtain the $500. Presumably, Richards could explain that at Orgad's trial as well.

9. An attorney's statements are admissible as party admissions under Federal Rule of Evidence 801(d)(2) if the attorney is shown to be the party's agent with regard to the making of the statement. *See United States v. Arrington,* 867 F.2d 122, 125–130 (2d Cir.1989) (attor-

ney's out of court statements were attributable to defendant and held admissible under Fed.R.Evid. 801(d)(2)); *United States v. McKeon,* 738 F.2d 26, 27–34 (2d Cir.1984) (defense lawyer's opening statement in prior trial is admissible in subsequent trial to contradict statements made on behalf of defendant in that subsequent trial); *United State v. Margiotta,* 662 F.2d 131, 142 (2d Cir.1981) ("Statements made by an attorney concerning a matter within his employment may be admissible against that party retaining the attorney.").

involve the assessment of a number of variables, including Leary's demeanor, the rest of the government's evidence, and an assessment of Richard's likely credibility. It is not a decision that can or should be made now.

Second, even if Orgad were to decide now not to call Richards at trial, the potential significance of Richards's testimony as rebuttal evidence is sufficiently great that I would not accept the waiver. "While the prospect of allowing someone to defend himself with one hand tied behind his back may present an interesting spectacle in a wrestling ring, the court's 'institutional interest in the rendition of just verdicts in criminal cases,' ... and the proper administration of justice require that a defendant not be so encumbered." *Arrington,* 867 F.2d at 129 (quoting *United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978)).

Third, even if such a waiver were offered and accepted, it would not necessarily cure the problem created by Richards's conflicts. I have a legitimate interest in ensuring that any future judgment remains intact on appeal or in future collateral proceedings. *Wheat,* 486 U.S. at 161, 108 S.Ct. 1692. Accepting a waiver of the right to call Richards now would not protect me from being, as the Supreme Court characterized it in *Wheat,* "whip-sawed" by a future claim that Orgad received ineffective assistance of counsel at trial as a result of his waiver. *Id. See also United States v. Kliti,* 156 F.3d 150, 156 (2d Cir. 1998) ("when faced with an attorney as a sworn or an unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony").

Fourth, even if a waiver were offered, accepted and effective in addressing the fact that Richards "ought to be called as a witness" within the meaning of DR 5–102, his appearance at trial would inevitably make him an unsworn witness to events to be proved at trial, an independent basis for his disqualification that I address in the next section.

I can quickly address DR 5–102's four exceptions to the rule of disqualification when an attorney ought to be a witness for his client, for they are clearly inapplicable here. Three of the exceptions (when the attorney's testimony relates solely to an uncontested issue, or to a matter of formality, or to the value of the legal services rendered) are not even arguably available to Orgad. The fourth exception arises when disqualification of the lawyer "would work a substantial hardship on the client because of the distinctive value of the lawyer or counsel in the particular case." DR 5–102(A)(4). In this regard, Richards contends that the harm to Orgad would be severe because (1) Richards has an "incredible bond" with Orgad; indeed, they have worked so closely that Richards "lost an engagement over this case;" and (2) Richards has spent "hundreds of hours" with Orgad preparing for the "California case and this case." Oral Arg. at 46.

These facts do not establish that Richard's disqualification would work a substantial hardship on Orgad. There are other attorneys who will dedicate themselves to Orgad's defense. That Richards "lost an engagement" in order to see the case all the way through may translate into a substantial hardship for Richards if he is disqualified, but I and DR 5–102 have only Orgad's interests in mind. And the mere fact that Orgad will have to bear the expense of retaining substitute counsel is not a cognizable hardship. *See United States v. Kwang Fu Peng,* 766 F.2d 82, 87 (2d Cir.1985) ("if the costs of retaining substitute counsel were, without more, deemed to constitute 'substantial hardship' under [the predecessor to DR 5–102(A)(4)], the exception would swallow the rule.").

Finally, even if there were some hardship inflicted on Orgad, it could not plausibly be said to stem from the "distinctive value" of Richards in this particular case. True, Richards successfully moved to dismiss the Los Angeles Indictment, but, as far as I can tell from the sparse record

before me, that success was due to the incompetence of the prosecutors, not the forensic skills of Richards. And while Richards may have distinguished himself from other lawyers in the way he dealt with Leary, a prospective witness, it was obviously not in a manner that enhanced the value of his services to Orgad. Finally, I do not intend to break the "incredible bond" between Orgad and Richards except with respect to the conduct of the trial. Richards may not appear as counsel at trial and may not be present in the courtroom (except as a witness) while the jury is present. However, provided Orgad retains separate counsel who can provide independent advice regarding the wisdom of keeping Richards on the defense team, Richards may participate in all other aspects of the case. *See Cunningham,* 672 F.2d at 1074 (disadvantage to client in disqualification of attorney is "reduced considerably" by the continuing ability of counsel to "participate in all aspects of the defense except the actual trial").

### 2. *Richards Would Be An Unsworn Witness At Trial*

Where an attorney has first-hand knowledge of events presented at trial, his role as an advocate may result in giving his client an unfair advantage over the government. Having experienced some of the events in question first-hand, Richards may be able to "subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Locascio,* 6 F.3d at 933. For example, "[i]f counsel were to cross-examine a witness as to her conversation with him, argue the credibility of her testimony or suggest alternative interpretations of her account of the conversation, he would place himself in the position of an unsworn witness." *United States v. McKeon,* 738 F.2d 26, 35 (2d Cir.1984) (citing *Cunningham,* 672 F.2d at 1074). "When an attorney acts as an advocate with respect to events in which he was a participant, the fact-finding process is impaired," *Locascio,* 6 F.3d at 934, and

since the defendant is not the party prejudiced by the impairment, a waiver by the defendant cannot solve the problem. *Id* (citing *Cunningham,* 672 F.2d at 1074–75). Even if Richards does not explicitly address the evidence at issue, his mere appearance at counsel table may distort the fact-finding process and require disqualification. *See Castellano,* 610 F.Supp. at 1167 (cited with approval in *Locascio,* 6 F.3d at 933).

Accordingly, courts may find that an actual, non-waivable conflict exists when an attorney will likely become an unsworn witness on a material issue of fact at trial. *See Ciak v. United States,* 59 F.3d 296, 304–05 (2d Cir.1995) ("Standing alone, becoming an unsworn witness is a basis for disqualification of an attorney."); *Locascio,* 6 F.3d at 933–34 (upholding disqualification where defendant's attorney would be an unsworn witness due to the attorney's presence during recorded conversations that constituted evidence at trial); *McKeon,* 738 F.2d at 34–35 (requiring disqualification where attorney essentially would be acting as both an advocate and a witness); *Cunningham,* 672 F.2d at 1075 (upholding disqualification where attorney would act as an unsworn witness for defendant).

Here, the government is legitimately concerned that when Richards (or another attorney at trial) advocates a particular interpretation of Richards's statements to Leary, the interpretation will be given added credibility due to Richards's status as counsel in the case. Orgad contends that the problem can be remedied without disqualifying Richards. Specifically, he suggests that (1) the transcripts of the conversations could be redacted to eliminate Richards's name; or (2) the government could be precluded from calling Leary as a witness and from introducing the tapes into evidence, thereby eliminating the unsworn witness problem.

The first proposal is unrealistic in the extreme. In addition to redacting any reference to Richards by name on the tapes or transcripts, Richards's voice would of

# 125

course have to be redacted from the tapes; otherwise the jury would recognize it. Thus, the jurors would have only transcripts, and they would be told that Leary's recorded conversations were with an unidentified attorney for Orgad. After engaging in those contortions to present the evidence, we would be deluding ourselves if we thought the jurors would not quickly figure out that the unidentified attorney is Richards. Indeed, they would be hard-pressed to come up with any other reason why the tape was not played or why the lawyer was not identified by name.

The second proposed solution is equally unavailing. The tapes constitute substantial evidence of Orgad's role in the charged conspiracy and his consciousness of guilt. It would hardly be fair to exclude it at trial "so that an accused can continue with conflicted counsel." *Locascio*, 6 F.3d at 934.

### 3. Richards's Conduct as "House Counsel" is Evidence of the Crime Charged Against Orgad

Yet another type of conflict of interest exists in this case because of Richards's efforts to arrange for an attorney for Leary. As set forth in the statement of facts, the taped conversations fairly support the inference that Richards sought to assign a member of his "infrastructure" of attorneys to Leary in order to keep her from cooperating against Orgad. Moreover, though Richards and Leary never explicitly discussed who would actually pay the attorney's fee, a juror could rationally infer that Richards intended to do so. Indeed, given Leary's purportedly dire need for money, that inference may be inescapable.

The Second Circuit had held that the payment of legal fees for others—"benefactor payments"—or otherwise arranging for their representation is highly probative evidence of the existence and membership of criminal enterprises: "We have previously indicated that payment of attorneys' fees by one individual on behalf of other suspected members of a criminal enterprise 'may imply facts about a prior or present relationship' between the benefactor and his beneficiaries." *United States v. Simmons*, 923 F.2d 934, 949 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991) (quoting *In re Shargel*, 742 F.2d 61, 64 (2d Cir.1984)). Though Richards denies that he was attempting to control Leary by assigning her a lawyer (and will presumably deny an intent to make a benefactor payment), his own actions would justify a jury in concluding otherwise, and thus contribute to the necessity of disqualification.

### 4. The Specter of Illegal Conduct by Richards

In *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984), the government revealed after trial on charges of insurance fraud that defense counsel had possibly been involved in similar criminal activity with someone connected to the scheme at issue in the trial. The Second Circuit reversed the conviction due to counsel's conflict of interest: "it must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes ..." *Cancilla*, 725 F.2d at 870. The court noted that counsel's potential exposure constituted a *per se* violation of the Sixth Amendment, and necessarily infected the entire proceeding. Similarly, in *Arrington*, defense counsel was implicated by a government witness in an alleged plot to silence witnesses. *See* 867 F.2d at 123. In upholding the disqualification of the lawyer, the Second Circuit observed that a refusal to disqualify would have saddled the client with "counsel encumbered with a strong incentive to conduct the trial in a manner that would minimize counsel's own exposure." *Id.* at 129.

Precisely such a conflict infects this case. A vigorous cross-examination of Leary may be helpful, perhaps even critical, to Orgad's defense at trial. But Richards has a powerful incentive to steer the defense away from such an examination. Title 18 of the United States Code, Section 1512(b)(3) makes it a crime to "corruptly persuade[ ] another person, or attempt[ ] to do so ... with the intent to hinder,

delay or prevent the communication to a law enforcement officer ... of information relating to the commission or possible commission of a Federal offense ...."[10] Solely with respect to his dealings with Leary, there is evidence that Richards may have violated this statute in several ways: (1) by attempting to persuade Leary to assert her Fifth Amendment privilege in order to protect Orgad from criminal investigation or prosecution, *see United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974); (2) by sending money to Leary without legal justification to persuade her to either refrain from speaking to law enforcement agents or to lie to them about her (and Orgad's) activities; and (3) by advising her to flee, and offering to facilitate her flight, for the same improper purpose.[11]

In short, Orgad should be represented at trial by an attorney who is not concerned that the defense will shed light on his or her own misconduct. Richards has good reason to harbor such a concern, and for that additional reason I will not permit him to represent Orgad at trial.

## CONCLUSION

For the foregoing reasons, Richards is disqualified from representing Orgad at trial.

So Ordered.

**10.** The Second Circuit has attributed to the "corruptly persuades" language in section 1512(b) the same well-established meaning already attributed by the courts to the comparable language of 18 U.S.C. § 1503, *i.e.,* "motivated by an improper purpose." *See United States v. Thompson*, 76 F.3d 442, 452 (2d Cir.1996).

**11.** Furthermore, the government alleges that Orgad headed a large conspiracy that included a number of low-level participants like Leary. I have no reason to believe that Leary was the only prospective witness at trial (for the government or the defense) whom Rich-

ards has spoken to during the course of his representation of Orgad. If Richards is to be believed, he thought at the time of his conversations with Leary that he was acting ethically and legally, but he now knows that others, including prosecutors and at least one judge, may well have a different view. I foresee the distinct possibility that, if Richards were to represent Orgad at trial, he would be reticent to inquire of other witnesses concerning his prior contacts with them for fear of bringing to light conduct of which the government would disapprove.